[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 13-11789

_____

D.C. Docket No. 0:91-cv-06717-CMA

THOMAS DEWEY POPE,

Petitioner - Appellee,

versus

SECRETARY, FLORIDA DEPARTMENT OF CORRECTIONS,

Respondent - Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(May 15, 2014)

Before CARNES, Chief Judge, and TJOFLAT and MARCUS, Circuit Judges.

MARCUS, Circuit Judge:

More than three decades ago, a Florida court sentenced habeas petitioner

Pope to die for the brutal murder of Kristine Walters. Pope now claims that he is

entitled to resentencing because his trial counsel provided ineffective assistance

during the penalty phase.  See Strickland v. Washington, 466 U.S. 668 (1984).

First, he argues that counsel did not investigate or present at the sentencing phase

of trial mitigation evidence bearing on Pope's childhood, military service,

dependence on drugs, or mental illness.  Second, he complains that counsel failed

to object when the prosecutor commented in closing argument to the jury that Pope

preferred to receive the death penalty rather than face life in prison.  After a prior

appeal to this Court and a remand, the district court granted habeas relief pursuant

to 28 U.S.C. § 2254.  Based on thorough review of the entire record presented to

the state court, we reverse because Pope has not shown that the Florida Supreme

Court's decision rejecting his Sixth Amendment claims was contrary to or an

unreasonable application of clearly established Supreme Court law.

## I.

We laid out the facts and procedural history of this case in our previous

opinion.  See Pope v. Sec'y for the Dep't of Corr. (Pope I), 680 F.3d 1271, 1277-

81 (11th Cir. 2012).  This section outlines the essential background needed for

deciding the current appeal.

## A.

Thomas Dewey Pope was convicted in 1982 in a Broward County, Florida,

court of the murders of Albert Doranz, Caesar Di Russo, and Kristine Walters.  On

January 19, 1981, the bodies of Doranz and Di Russo were discovered in Walters's

apartment.  Walters's body was found three days later in a canal.  Doranz and Di Russo had been shot multiple times.  Walters had been shot six times with exploding ammunition, her skull had been fractured, and she was thrown into a canal while still breathing.  Pope v. State, 441 So. 2d 1073, 1074 (Fla. 1983).

At trial, Pope and his girlfriend, Susan Eckard, admitted that they had been with Doranz and Walters at Walters's apartment on the Friday night Doranz and Di Russo were killed.  Id. at 1075.  According to Eckard, Pope had arranged a drug deal with Doranz and Di Russo so that he could steal and sell their cocaine.  Eckard and Pope left the apartment, but when they returned, Pope and Doranz convinced Walters to leave with Eckard and go to Pope's apartment.  Once the women had left, Pope shot and killed Doranz and Di Russo.  Pope returned to his apartment later that night, reported there had been trouble, and told Walters to stay away from Doranz.  The next day Walters checked into a motel, where Pope supplied her with Quaaludes and cocaine.  According to Eckard, Pope said he knew he had to get rid of Walters, though he regretted it because he had become fond of her.  On Sunday, Pope drove Walters to an isolated road where he shot, beat, and ultimately drowned her.  Eckard testified that Pope told her in detail how he killed Walters, including how the rifle had broken when he used it to bash her skull.  Id. at 1075.

3

Eckard's testimony also addressed Pope's drug use. She read a letter from Pope in which he admitted to buying and using Quaaludes and cocaine the night of the murders. Eckard acknowledged that she and Pope had attended parties featuring widespread drug use and that Pope would regularly go several days at a time without sleeping. Two other witnesses, Clarence Lagle and Edith Cribb, testified about Pope's drug use and drug dealing.

During the guilt phase, Pope's attorney, Scott T. Eber, presented the testimony of Dr. William Weitz, a clinical psychologist who specialized in the treatment of post-traumatic stress disorder ("PTSD") in Vietnam veterans. Weitz opined that, based on an interview of Pope and a review of his military records, Pope suffered from PTSD. According to Weitz, Pope as a Marine rifleman "adopted a survivor-like style of living" in which he valued basic physical subsistence above all else. Weitz traced this behavior to Pope's emotional and psychological attempts to deal with his combat experience, in particular one experience when Pope survived a mortar attack that killed friends around him. Weitz told the jury that the only time Pope became emotional during the interview was upon describing his return from Vietnam to the United States. Pope felt he had been manipulated and that his time spent at war was all for nothing. Weitz explained that Pope, like other returning Vietnam veterans with similar psychological conditions, showed an inability to readjust to society. Weitz

4

testified that he thought it unusual for a person like Pope, who highly valued personal freedom, to place himself in a situation where he could be confined for the rest of his life for the purpose of gaining money or drugs.

Pope testified at length during the guilt phase of trial. Among other things, he told the jury that he had served in the infantry in the Marines and spent about five months in Vietnam. He said he saw "some combat" when distributing supplies to soldiers in the field, though "not mostly like a heavy combat all of the time." Pope recounted his honorable discharge and his clean disciplinary record. He explained that he and other returning Marines were greeted in the United States by "hippies" who threw rocks at them because they had served in Vietnam, and told them they "wasted the taxpayers['] money and killed innocent women and children." Pope said that he started doing drugs after the war and, after trying various jobs, he began "wheeling and dealing" drugs full time. His testimony revealed that he, along with Doranz and Di Russo, had been deeply involved in guns and drugs. Finally, Pope detailed his use of cocaine and Quaaludes throughout the weekend of the murders.

The jury convicted Pope of three counts of first degree murder. After the jury returned the guilty verdicts, Pope and his trial counsel, Eber, had the following exchange with the court outside the presence of the jury concerning Pope's sentencing phase presentation:

Eber:  I have discussed the situation that is presently before us with Mr. Pope.  I have discussed it informally with the Court.  Mr. Pope does not wish me to argue to the jury at this point.  I understand that it is my obligation as his attorney to do so, however.  Mr. Pope feels that it is my obligation, as his attorney, to follow his wishes in this situation.  I believe he may have something he desires to say, if the Court would entertain that.  But I have told him, and I believe that it is my obligation to make a presentation to the jury.

The Court:  Alright.  If you want to say anything, Mr. Pope, you may.

Pope:  I'd really rather not have him make a presentation on my behalf to the jury.  You only have two choices, and I know what my choice is.  I know I'm not trying to take your job, that is not what I want and is not necessarily what you are going to give me; but I would rather have the death sentence than the twenty-five years in prison.

The Court:  Alright.  I still think you ought to speak on his behalf as your obligation.  You made your wishes known.  I can understand that.  Thank you.  Bring the jury in.

Pope I, 680 F.3d at 1278 (emphasis added).

Eber called Pope's mother as the only witness during sentencing.  In her testimony, which takes just over a page in the transcript, she said only that Pope "has never been the same" since returning from Vietnam and that she was "sure he has done things since he came back that he has never done before."  She asked the jury to have mercy on her son, who she believed was innocent.  **[Id.]**  Eber did not

6

present any expert testimony at sentencing, from Dr. Weitz or any other mental health professionals.

During his sentencing argument to the jury, the prosecutor walked through the statutory aggravating factors. Turning to mitigation, he began:

> Incidentally, Mr. Pope has announced that he would rather receive a death penalty than life imprisonment. I would say to you that your verdict, your recommendation, should not be based on that. You owe that to yourselves; and, in fact, you owe that to Mr. Pope. I ask that your recommendation be based on these factors, as the Court will indicate that to you. It is one thing for him to say that to you now because where there is life there is hope. The reason I'm saying that is because there is no hope for the life of Al Doranz, Caesar [Di Russo] and [Kristine] Walters. I'm saying it because this thing has to end sometime. You have to do sometime what is unpleasant and say you don't deserve to live if you have taken three lives.

Defense counsel Eber did not object to the prosecutor's comment. Eber's own sentencing presentation to the jury on behalf of Pope was limited: "I will be brief. I want to let you know that Thomas Pope has specifically asked me not to get up and say anything to you." Eber explained that Pope maintained his innocence. "He doesn't want to beg you for mercy but I feel that it is my obligation to tell you why I think that the death penalty is not appropriate in this case." Eber directed a handful of sentences to aggravating factors pressed by the prosecution. He then identified at least three mitigating factors: Pope lacked a significant criminal history; Pope had been suffering from extreme mental or emotional disturbance, which Eber coupled with his substantially impaired

7

capacity to appreciate the criminality of his conduct or conform his conduct to law; and Pope went through experiences that had a profound effect and changed his personality.

Notably, the jury recommended life sentences for the murders of Doranz and Di Russo. But it recommended the death penalty for the killing of Walters, by a vote of nine to three. At the Spencer hearing conducted after the jury made its recommendations,[1] Eber asked the court to consider Pope's military service and PTSD as mitigating factors. Eber stated that "Pope went off and lived like an animal in the jungles." Referencing Dr. Weitz's testimony, Eber argued that Pope's experiences "did something profound to him" that explained the way his life had gone, including his involvement with drugs. The judge responded: "We all know that all war is hell. There is nothing original about that. Some people try to make themselves better after they get out of war, others unfortunately, go the other way." Offered a chance to speak, Pope had nothing to say.

The trial court adopted each of the jury's recommendations. It found four aggravating circumstances concerning the murder of Walters: (1) Pope was previously convicted of two capital felonies, the murders of Doranz and Di Russo, Fla. Stat. § 921.141(5)(b); (2) the murder was committed to avoid arrest, id.

---

[1] Under Florida law, a Spencer hearing gives the defendant, his counsel, and the State the opportunity to be heard and to present additional evidence to the sentencing judge after the jury has offered its recommendation. See Spencer v. State, 615 So. 2d 688, 681 (Fla. 1993) (per curiam).

8

§ 921.141(5)(e); (3) the murder was especially heinous, atrocious, or cruel, because of its nature and because Pope showed no remorse, id. § 921.141(5)(h); and (4) the murder was committed in a cold, calculated, and premeditated manner, id. § 921.141(5)(i).  The judge found one mitigating factor, Pope's service in Vietnam and honorable discharge from the Marines, under the "catchall" provision, Fla. Stat. § 921.141(6)(h).  The trial judge sentenced Pope to die.

B.

Pope took a direct appeal to the Florida Supreme Court, which affirmed the convictions and sentences.  Pope v. State, 441 So. 2d at 1074.  Pope then filed a state court motion for post-conviction relief claiming ineffective assistance of counsel pursuant to Florida Rule of Civil Procedure 3.850.  Pope alleged twelve errors by trial counsel, including two penalty-phase ineffectiveness claims: (1) counsel's failure to object to improper comments by the trial judge and the prosecutor; and (2) counsel's failure to present mitigating evidence related to Pope's background.  The state court rejected ten of Pope's allegations, including the two tied to the penalty phase, as either failing to state a Strickland claim or as being refuted by the record.  The court conducted an evidentiary hearing on two remaining claims, including one in which Pope argued that his trial counsel had been ineffective for presenting Pope's post-traumatic stress disorder against his client's wishes.

9

As part of that hearing, Eber gave a videotaped deposition on August 20, 1987, which shed tangential light on Pope's penalty-phase ineffectiveness claims. Eber stated that he remembered Pope asking him not to present any mitigating factors or circumstances. Eber did not recall investigating any mitigation factors, talking with any of Pope's family members, or finding out about his childhood. Eber explained that he did not employ an investigator because he had been told he could only spend a few hundred dollars. Based on evidence from the hearing, the state court denied Pope's remaining two claims. It concluded that Pope knew, understood, and concurred in the decision of his trial counsel to present the testimony of Dr. Weitz during the guilt phase.

Pope appealed this post-conviction decision to the Florida Supreme Court, which affirmed the trial court's denial of the Rule 3.850 motion. Pope v. State, 569 So. 2d 1241, 1246 (Fla. 1990) (per curiam). The Florida Supreme Court affirmed the summary denial of Pope's claims that "trial counsel failed to object to improper comments by the prosecutor" and that "trial counsel failed to present evidence of mitigating circumstances during the penalty phase." Id. at 1245. The Florida Supreme Court noted that it had "reviewed the motions, files, and records in this case and agree[d] with the trial court that they conclusively demonstrate that Pope is entitled to no relief in connection with the above claims." Id.

10

Meanwhile, as his Rule 3.850 motion was pending, Pope petitioned the Florida Supreme Court for a writ of habeas corpus based on ineffective assistance of appellate counsel. The Florida Supreme Court refused Pope relief. Pope v. Wainwright, 496 So. 2d 798, 800 (Fla. 1986). In addition, Pope has filed in state court a number of other unsuccessful motions and petitions. Pope I, 680 F.3d at 1280; see, e.g., Pope v. State, 702 So. 2d 221 (Fla. 1997) (per curiam), reh'g denied (Fla.1998).

C.

In 1991, Pope filed a petition for a writ of habeas corpus in the United States District Court for the Southern District of Florida. Pope's petition presented seven claims, including an allegation of ineffectiveness of penalty-phase counsel. The district court dismissed without prejudice, finding that the petition included both exhausted and unexhausted claims. After further litigation in state court, in 1999 Pope amended his federal habeas petition, which included nearly identical penalty-phase ineffectiveness allegations. An array of motions from the parties and years of litigation followed.

In 2008, the district court granted Pope's habeas petition in part, concerning penalty-phase ineffectiveness, and rejected his remaining claims. The court concluded that Pope's counsel performed deficiently by failing to discover and present any of the available mitigation evidence and by not objecting to the

prosecutor's improper comment.  Particularly in light of the three jurors' votes for life, the district court found a reasonable probability that the jury would have recommended a life sentence but for counsel's errors.

Pope I vacated the grant of habeas relief and remanded to allow the district court to hold a § 2254(e)(2) hearing to develop evidence bearing on Pope's allegations.  680 F.3d at 1298.  We began by determining that AEDPA applied.  Id. at 1283.  We decided that Pope had not procedurally defaulted before the state court, which had rejected Pope's claims on the merits, and that Pope had exhausted his claims in state court.  Id. at 1285, 1287.  We concluded that the district court had erred in granting habeas relief on a relatively empty record that "le[ft] us with Pope's untested penalty-phase allegations, and little, if anything else to consider."  Id. at 1287-88.  We remanded for the district court to conduct a § 2254(e)(2) hearing concerning Pope's penalty-phase ineffectiveness claims.  Id. at 1298.  We affirmed the district court's denial of habeas relief as to Pope's other claims.  Id. The Supreme Court denied certiorari.  Pope v. Crews, 133 S. Ct. 1625 (2013).

On remand, the district court held a four-day evidentiary hearing in October 2012.  Pope presented testimony from Eber and Dr. Weitz, as well as neuropsychologist Dr. David Price and mitigation specialist Steven Gustat.  The State put forward testimony from psychologist Dr. Damarys Sanchez.  On March 26, 2013, the court again ordered habeas relief.  The district court first determined

that, because AEDPA applied, and because the Florida Supreme Court had adjudicated Pope's claims on the merits, Cullen v. Pinholster, 131 S. Ct. 1388 (2011), required that Pope satisfy § 2254(d) based only on the record before the state post-conviction court. The district court rejected Pope's assertion that Pope I had implicitly found that the requirements of § 2254(d) had been met. Conducting its own § 2254(d) review, the court concluded, based only on the evidence presented in the state proceedings, that Pope sufficiently established the Florida Supreme Court's determination was unreasonable. The district court then conducted a de novo review of Pope's Strickland claims, this time considering the federal hearing evidence. Again, the court concluded that Pope was entitled to habeas relief under Strickland based on all of the evidence presented before the state court and at the federal habeas hearing.

The Secretary timely appealed the district court judgment to this Court.

## II.

### A.

We review de novo a district court's grant of a petition for habeas corpus. McNair v. Campbell, 416 F.3d 1291, 1297 (11th Cir. 2005). We also review questions of law and mixed questions of law and fact de novo, while district court findings of fact are reviewed for clear error. Id. Whether counsel provided

13

ineffective assistance presents a mixed question of law and fact that we review de novo. Id.

As we found in Pope I, AEDPA applies to Pope's habeas petition. 680 F.3d at 1283. Under AEDPA, if a petitioner's habeas claim "was adjudicated on the merits in State court proceedings," a federal court may not grant habeas relief unless the state decision (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).[2] Pope does not argue under § 2254(d)(2) that the Florida Supreme Court made an unreasonable determination of facts in denying his claim. Thus, to overcome the high habeas threshold, Pope must establish under § 2254(d)(1) that the Florida Supreme Court's refusal to grant him relief was

---

[2] In full, § 2254(d) provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim --
>
> > **(1)** resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > **(2)** resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

14

"contrary to" or involved an "unreasonable application of" clearly established federal law as determined by the United States Supreme Court.  This he cannot do.

"Under § 2254(d)(1)'s 'contrary to' clause, we grant relief only 'if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts.'"  Jones v. GDCP Warden, No. 11-14774, 2014 WL 1088312, at *10 (11th Cir. Mar. 20, 2014) (alterations in original) (quoting Williams v. Taylor, 529 U.S. 362, 413 (2000)).  For § 2254(d)(1), clearly established federal law includes only the holdings, not the dicta of Supreme Court decisions, nor the opinions of this Court.  White v. Woodall, 134 S. Ct. 1697, 1702 (2014).  "Under § 2254(d)(1)'s 'unreasonable application' clause, we grant relief only 'if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.'"  Jones, 2014 WL 1088312, at *10 (alteration in original) (quoting Williams, 529 U.S. at 413).  The Supreme Court has interpreted § 2254(d) as requiring that, "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  Harrington v. Richter, 131 S. Ct. 770, 786-87 (2011).  "[A]n

15

'unreasonable application' of [Supreme Court] holdings must be 'objectively unreasonable,' not merely wrong; even 'clear error' will not suffice." Woodall, 134 S. Ct. at 1702. In other words, Pope must establish that no fairminded jurist would have reached the Florida court's conclusion. See Richter, 131 S. Ct. at 786-87; Holsey v. Warden, Ga. Diagnostic Prison, 694 F.3d 1230, 1257-58 (11th Cir. 2012). "If this standard is difficult to meet, that is because it was meant to be." Richter, 131 S. Ct. at 786.

Cullen v. Pinholster further mandated that a federal court must determine whether a habeas petitioner has satisfied § 2254(d) based only on the "record that was before the state court that adjudicated the claim on the merits." 131 S. Ct. at 1398. In Pinholster, the Ninth Circuit had held that a federal court making a § 2254(d) habeas determination could consider additional evidence not presented to the state court. Pinholster v. Ayers, 590 F.3d 651, 666 (9th Cir. 2009) (en banc). The Supreme Court reversed. Part II of Justice Thomas's majority opinion explained that § 2254(d) contained "backward-looking language requir[ing] an examination of the state-court decision at the time it was made. It follows that the record under review is limited to the record in existence at that same time i.e., the record before the state court." Pinholster, 131 S. Ct. at 1398. This reading of the text was "compelled by 'the broader context of the statute as a whole,' which demonstrates Congress' intent to channel prisoners' claims first to the state

16

courts." Id. at 1398-99 (quoting Robinson v. Shell Oil Co., 519 U.S. 337, 341 (1997)). "It would be contrary to that purpose to allow a petitioner to overcome an adverse state-court decision with new evidence introduced in a federal habeas court and reviewed by that court in the first instance effectively de novo." Id. at 1399.

Though the state habeas court had not held a hearing, in Pinholster the Supreme Court observed that "[§] 2254(d) applies even where there has been a summary denial," in which case a petitioner "can satisfy the 'unreasonable application' prong of 2254(d)(1) only by showing that 'there was no reasonable basis'" for the state court decision. Id. at 1402 (quoting Richter, 131 S. Ct. at 784). "After a thorough review of the state-court record," the Supreme Court "conclude[d] that Pinholster ha[d] failed to meet that high threshold." Id. at 1402-03. "Given what little additional mitigating evidence Pinholster presented in state habeas, we cannot say that the California Supreme Court's determination was unreasonable. Having already heard much of what is included in the state habeas record, the jury returned a sentence of death." Id. at 1410.

Applying the unwavering language of Pinholster, our review here is limited to the record that was presented to the state post-conviction court. Justice Thomas's majority opinion rests on a clear, emphatic rule: if a state court has adjudicated the claim on the merits, then a petitioner must satisfy § 2254(d)(1) based only on the record before that state court. Pope I found that the Florida

17

Supreme Court had reached a merits determination.  680 F.3d at 1286 ("In short, whether the Florida Supreme Court rejected the claims for facial insufficiency or only after concluding that they were refuted by the record, the determination would have been on the merits."); see Borden v. Allen, 646 F.3d 785, 809-816 (11th Cir. 2011); Powell v. Allen, 602 F.3d 1263, 1272-73 (11th Cir. 2010).  Therefore, as all of the parties now concede, the § 2254(d) inquiry is limited to the record before the Florida Supreme Court in 1990 when it rejected Pope's sentencing-phase ineffectiveness claims on the merits.  See Pope v. State, 569 So. 2d at 1245.  Indeed, the district court rightly followed Pinholster and initially performed a § 2254(d) analysis based solely on what was found in the state court record.

B.

Based on the state record, Pope cannot satisfy § 2254(d) for the reasons we explain below.  Pope suggests, however, that our previous opinion answered the § 2254(d)(1) question by implying that the threshold inquiry had been satisfied.  But Pope I did not rule on § 2254(d).  Nor did it necessarily imply that § 2254(d) had been satisfied.  It is true that Pope I ordered a federal evidentiary hearing under § 2254(e)(2).  It is also true that, under Pinholster, § 2254(d) must be satisfied before a federal habeas court may consider any § 2254(e)(2) evidence.  See 131 S. Ct. at 1398; id. at 1412 (Breyer, J., concurring in part and dissenting in part) ("[W]e cannot say whether an (e) hearing is needed until we know whether the

18

state court, in rejecting Pinholster's claim on the basis presented to that state court, violated (d)."). But Pope I did not examine or even mention Pinholster. The Supreme Court handed down Pinholster after Pope I had been fully briefed and argued but before Pope I issued. Instead of finding that the Florida Supreme Court decision was contrary to or an unreasonable application of Strickland under § 2254(d)(1), we remanded for a federal evidentiary hearing because the state record was "barren." 680 F.3d at 1288. In short, we are not bound by any claimed § 2254(d) holding drawn from Pope I because we never decided the question. What's more, insofar as Pope I suggested that § 2254(e)(2) hearing evidence could be used as part of the § 2254(d) analysis, we could not follow that ruling because it cannot be reconciled with the Supreme Court's unambiguous holding in Pinholster. See 131 S. Ct. at 1398.[3]

---

[3] Though not invoked by either party, the law-of-the-case doctrine requires that we follow legal conclusions reached in a prior appellate decision in the same case. This That & The Other Gift & Tobacco, Inc. v. Cobb Cnty., Ga., 439 F.3d 1275, 1283 (11th Cir. 2006) (per curiam). But law-of-the-case principles do not apply when "the prior decision was clearly erroneous and would result in a manifest injustice." Oladeinde v. City of Birmingham, 230 F.3d 1275, 1288 (11th Cir. 2000). We recognize this exception because the law-of-the-case doctrine does not limit the court's power; instead, it "is an expression of good sense and wise judicial practice." Venn v. St. Paul Fire & Marine Ins. Co., 99 F.3d 1058, 1063 (11th Cir. 1996) (quoting DeLong Equip. Co. v. Wash. Mills Electro Minerals Corp., 990 F.2d 1186, 1196 (11th Cir. 1993)). The "clear error" exception, albeit narrow, applies "when the legal error is beyond the scope of reasonable debate." Jenkins Brick Co. v. Bremer, 321 F.3d 1366, 1370-71 (11th Cir. 2003). There can be no debate that Pinholster limits our § 2254(d) review to the record before the state court. 131 S. Ct. at 1398. Moreover, we have held that it would be manifestly unjust to apply to a material issue a legal principle that is clearly erroneous in light of binding authority. See Culpepper v. Irwin Mortg. Corp., 491 F.3d 1260, 1272 (11th Cir. 2007); Murphy v. FDIC, 208 F.3d 959, 966 (11th Cir. 2000).

Pope I left open the § 2254(d) question. The Supreme Court has held that we must decide this essential matter based on the record presented to the state court. Therefore, we are required to determine today whether the Florida Supreme Court's denial of relief was contrary to or an unreasonable application of Strickland based only on that record.[4]

### III.

Pope asserts two Strickland claims.  First, he says that his sentencing-phase counsel was ineffective for failing "to conduct any background investigation and to present any mitigation evidence."  He also argues counsel was ineffective for failing to object to "prosecutorial misconduct in the state's penalty phase closing

---

[4] Pope also suggests at one point in his brief that our inquiry in this appeal is limited to whether Pope presented sufficient additional evidence at the federal evidentiary hearing to substantiate his allegations.  See Pope I,  680 F.3d at 1294 ("[Pope's] allegations, considered together, are powerful, and if he is able to prove they are true, he would be entitled to habeas relief.").  As we have explained, however, and indeed as the petitioner now recognizes, Pinholster commands that we must conduct the § 2254(d) analysis based only on the evidence then available to the state post-conviction court, and not on an evidential foundation developed later and reviewed for the first time in federal court.

But, even if we could look to the evidence drawn from the federal hearing -- and we cannot -- Pope still would not have met his high burden.  In the first place, Pope did not prove all of the allegations contained in his habeas petition during the district court hearing.  Thus, for example, Pope did not establish that he suffered from bipolar disorder, one of the more significant mental health allegations in his federal habeas petition.  Moreover, the evidence adduced at the federal hearing was insufficient to establish Strickland prejudice.  Again, the aggravating evidence was extremely powerful.  And the bulk of the mitigating evidence was presented to the jury, which heard about Pope's war record, his combat-related PTSD, and his substantial drug use. Regardless, there is no record evidence, even drawn from the federal habeas hearing, that Pope would have allowed the presentation of mitigating evidence if he had been properly advised by counsel.  Finally, the federal hearing turned up no substantial new evidence concerning prejudice caused by trial counsel's failure to object to the prosecutor's comment about Pope's preference for the death penalty. See infra Part III.B-C.

20

argument" when the prosecutor "disclosed non-record evidence that Mr. Pope preferred death."

Strickland requires that Pope establish both "that his counsel provided deficient assistance and that there was prejudice as a result." Richter, 131 S. Ct. at 787. "To establish deficient performance, a person challenging a conviction must show that 'counsel's representation fell below an objective standard of reasonableness.'" Id. (quoting Strickland, 466 U.S. at 688). Prejudice requires showing "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id.

In this case, we need not address whether counsel performed deficiently because Pope cannot establish prejudice. See id. at 697 ("[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed."); Bishop v. Warden, GDCP, 726 F.3d 1243, 1254 (11th Cir. 2013) ("[A] court need not address both [Strickland] prongs if the petitioner has made an insufficient showing on one of them."). The long and short of it is that the Florida Supreme

21

Court had a reasonable basis for concluding, based on the record it was presented, that Pope had not established Strickland prejudice.

## A.

The state post-conviction record available to the Florida Supreme Court in 1990 when it rejected Pope's claims is extraordinarily thin. In relevant part, that record contains materials drawn from Pope's trial, including transcripts of the guilt-phase testimony of Pope, Eckard, Dr. Weitz, and other witnesses, as well as the penalty-phase testimony of Pope's mother. It includes the prosecutor's sentencing-phase comment on Pope's preference for death over life in prison, along with Eber's abbreviated mitigation argument and his statements at the Spencer hearing. The state record also contains Pope's state post-conviction filings, in which he argued that "Eber failed to present any evidence of mitigating circumstances during the penalty phase of [Pope's] trial other than the standard plea of mercy from [Pope's] mother." Pope stated only at the highest order of abstraction that "Eber did little or nothing to develop evidence of such mitigating factors such as defendant's psychological history, performance in the military, or his capacity for rehabilitation." Pope argued that, "in light of the lengthy period of deliberation on guilt, two jury recommendations of life, and the far from unanimous, single recommendation of death, the presentation of convincing evidence and argument for life was all the more important." Finally, the state

22

record contains the depositions of Eber and Pope taken as part of the state post-conviction proceedings.  Notably, however, Pope did not attach to his state post-conviction filings any affidavits, declarations, or exhibits with evidence bearing on his penalty-phase ineffectiveness claims, nor was a hearing held addressing those claims.

B.

On this limited state record, Pope does not come close to showing he was prejudiced by any failure of his counsel to investigate and present mitigation evidence at the penalty phase, let alone that the Florida Supreme Court's determination was an unreasonable application of Strickland.  We say so for a number of reasons.  For starters, if a petitioner "instructed his counsel not to offer any mitigating evidence," then "counsel's failure to investigate further could not have been prejudicial under Strickland."  Schriro v. Landrigan, 550 U.S. 465, 475 (2007).  This principle rests on the theory that an obstructionist client would have prevented the introduction of any mitigation evidence that may have been discovered from a fuller search.  See id. at 476-77; Cummings v. Sec'y for the Dep't of Corr., 588 F.3d 1331, 1360 (11th Cir. 2009) ("[T]here cannot be a reasonable probability of a different result if the defendant would have refused to permit the introduction of mitigation evidence in any event."  (citing Strickland, 466 U.S. at 694)).  To establish Strickland prejudice, then, a petitioner who has

23

told trial counsel not to present mitigation evidence must show a reasonable probability that, if he had been more fully advised about the mitigating evidence and its significance, he would have permitted trial counsel to present the evidence at sentencing. See Gilreath v. Head, 234 F.3d 547, 551 (11th Cir. 2000). Beyond that, the petitioner must also establish that this new mitigating evidence, if heard by the jury, would have with a reasonable probability led the jury to recommend life instead of death. See id. at 551-52.

Applying Landrigan, we have held in similar cases that state habeas court denials of relief were not contrary to or unreasonable applications of clearly established Supreme Court law. For example, in Cummings, we found the Florida Supreme Court had not run afoul of clearly established Supreme Court law in denying relief because, under Landrigan, Cummings had not shown that he would have agreed to the presentation of new mitigation evidence even if it had been investigated and discovered. 588 F.3d at 1366. Like Pope, Cummings never testified that he would have allowed trial counsel to present new mitigating evidence. Id. Instead, he "consistently opposed the presentation of mitigating evidence at his trial" and told counsel and the trial court "repeatedly that he did not want a penalty-phase presentation." Id. In addition, his stated preference for the death penalty "further indicat[ed] Cummings would not have consented to the

24

presentation of mitigating evidence whose only purpose was to convince the jury to recommend life instead of death." Id.

In this case, the state record makes it abundantly clear that Pope had instructed his attorney not to present any mitigation evidence at the penalty phase of the trial. At the beginning of the sentencing hearing, before any presentation of evidence or arguments were made to the jury, Eber told the court that "Mr. Pope does not wish me to argue to the jury at this point." Pope then told the court, "I'd really rather not have him make a presentation on my behalf to the jury. You only have two choices, and I know what my choice is. . . . I would rather have the death sentence than the twenty-five years in prison."

Because Pope gave Eber unmistakable instructions not to put on mitigation evidence, Pope must establish (1) a reasonable probability that he would have authorized Eber to present the evidence if he had been advised more fully about the available mitigating evidence, and (2) a reasonable probability that this evidence, if presented, would have convinced a jury that the death penalty was unwarranted based on the aggravating and mitigating factors. See Landrigan, 550 U.S. at 475-77; Strickland, 466 U.S. at 694; Gilreath, 234 F.3d at 551-52. Pope cannot do either.

Nothing in the state record suggests he "would have changed his directions to his counsel had he been more fully informed about mitigating evidence."

25

Gilreath, 234 F.3d at 552.  Pope argues that, because he did not interrupt the brief penalty-phase testimony of his mother or stop his attorney from making similarly short sentencing remarks, we can infer that Pope would not have stood in the way of broader mitigation had it been discovered.  This argument ignores Pope's explicit statements to the contrary and reverses his burden.  It is Pope who must affirmatively establish that, despite his instructions to his attorney and his comments to the court, there is a reasonable probability that he would have allowed mitigation evidence about his mental health or personal history to be presented if properly advised.  No evidence in the state record supports such a showing.  Pope has offered no affidavit, deposition, or statement from himself, his counsel, or even from his mental health experts claiming that the petitioner would have changed his instructions to counsel if advised of mitigation evidence.  Pope argues, nevertheless, that no one asked him the pivotal question and therefore this omission cannot be held against him.  This argument is without merit -- it too misplaces the burden.  Because Pope instructed his trial counsel not to present mitigating evidence, the law plainly imposes on Pope the burden to establish that he would have allowed additional mitigation to be presented if he had been properly advised.  See Landrigan, 550 U.S. at 477; Strickland, 466 U.S. at 696; see also Gilreath, 234 F.3d at 551 ("Petitioner must show a reasonable probability that -- if Petitioner had been advised more fully about character evidence or if trial

26

counsel had requested a continuance -- Petitioner would have authorized trial counsel to permit such evidence at sentencing.").

Other evidence in the state record only magnifies the substantial doubt that Pope would have allowed his lawyer to present any additional mitigation. Depositions of the public defender first assigned to represent Pope, Douglas McNeill, suggest that Pope deeply opposed the presentation of mitigation evidence, particularly related to his mental health. "Pope," McNeill said, "from the start of the case, had been saying that if he were convicted of first degree murder that he did not wish to have evidence of mitigation presented to the jury, that he wished to simply be sentenced to the electric chair." Indeed, while McNeill was his attorney, Pope refused to meet with a psychologist, Dr. Weitz. Pope himself explained, "I just didn't want to talk to a shrink. It was inconsistent with any evidence. I would consider it an embarrassment." According to Pope, "it just seemed like a foolish thing to come in here and stand before a jury and say, 'I am innocent, really, I am innocent,' for a week or two . . . and then when you are convicted, then you stand before them and say, 'Vietnam did it.'"[5] At the state post-conviction hearing, Pope testified that he ultimately had agreed to talk to Dr. Weitz upon the advice of the trial judge. Still, Pope insisted to Eber and to the trial

_____

[5] In his post-conviction testimony, Pope also traced his opposition to mental health experts to conversations with cellmates who told him "psychiatrists were put on the stand to say whatever . . . the client's lawyer paid them to say. If you want him to be loony toon, then they are loony toon. If you want him to be sane, they said you are sane."

court at the outset of the penalty phase that he did not want any mitigation evidence presented on his behalf.  Quite simply, the Florida Supreme Court had a reasonable basis for denying relief because Pope failed to establish that he would have allowed trial counsel to introduce additional mitigation evidence at sentencing if properly represented and advised.

The Florida Supreme Court also had another wholly independent and reasonable basis for denying relief: Pope failed to establish that, even if he would have allowed the presentation of new mitigating evidence, there was a reasonable probability the jury would have recommended against the death penalty.  "To assess that probability, we consider 'the totality of the available mitigation evidence -- both that adduced at trial, and the evidence adduced in the habeas proceeding' -- and 'reweig[h] it against the evidence in aggravation.'"  Porter v. McCollum, 558 U.S. 30, 41 (2009) (quoting Williams, 529 U.S. at 397-98).  We cannot say that no fairminded jurist would have agreed with the Florida Supreme Court that Pope failed to satisfy this standard: serious aggravating factors accompanied the calculated murder, and the state record itself contains no potential mitigation evidence that was kept from the jury.

First, the evidence in aggravation was substantial and powerful. The trial court found four statutory aggravating factors.  Pope had been convicted of two other capital felonies, the murders of Doranz and Di Russo, which he committed

28

just a few days before he murdered Walters. Pope also undeniably committed the murder of Walters in order to avoid arrest. Pope told Eckard that Walters had to die because her knowledge could reveal his role in the other slayings. Pope committed the murder in a cold, calculated and premeditated manner. About two weeks before the killings, Pope acquired an AR-7 rifle -- a .22 semi-automatic clip-fed shoulder-held firearm that could be folded up and carried in a stock. Pope equipped it with a silencer. He bought ammunition, including a box of Devastator ammunition with explosive charges that would detonate after impact. After shooting Doranz and Di Russo, Pope discussed with Eckard his plans to kill Walters before going through with it. Though Pope said he had become fond of Walters, he did not let feelings interrupt his bloody plan. He deliberated about it over a period of days, plied the victim with drugs at a motel, and then horrifically murdered her. Indeed, the evidence establishes that Pope's professed fondness for the victim did not prevent him from killing her in a manner that was especially heinous, atrocious, or cruel. Pope told Eckard that he drove Walters to an unpaved side road. He asked her to get out of the car and check the headlight, which had burned out. Pope shot her from behind. He then shot her with the rifle pressed close to her abdomen, where the explosion of the bullets at impact would have been extraordinarily painful. Pope v. State, 441 So. 2d at 1077. After six shots did not kill her, Pope bludgeoned her with the barrel of the AR-7 rifle. When the

29

barrel broke over her head, he dragged her -- still alive -- to a canal to drown. Id.

Any new mitigating evidence would have had to be substantial indeed to

undermine confidence in a sentence supported by these aggravating factors.

But the state record contains <u>no</u> new mitigating evidence. Pope only alleges

that an adequate investigation would have revealed that he endured poverty and

physical abuse as a child and had a history of honorable military service, mental

illness, and drug dependency. Yet the state record contains nary a trace of any

additional evidence beyond what the jury actually heard. Because the state record

contains no new evidence, we cannot recognize a change in "the balance of

aggravating and mitigating circumstances" presented to the jury. <u>Strickland</u>, 466

U.S. at 695.

The state record is silent about Pope's childhood history of poverty and

abuse. During his guilt-phase testimony, Pope did not mention his upbringing.

The brief sentencing-phase testimony from Pope's mother similarly said nothing

about his youth. The state record contains nothing that illuminates the conditions

of Pope's childhood. Pope's state post-conviction petition did not even identify

counsel's failure to investigate a background of poverty and abuse, much less

provide documentary support through affidavits, declarations, or exhibits.

Unidentified evidence can carry no weight in our prejudice analysis. The Florida

Supreme Court had a reasonable basis for discerning no prejudice from counsel's

30

alleged failure to investigate and present evidence of childhood conditions: the state record said virtually nothing about what that evidence might be.

Furthermore, the state record did contain extensive evidence about Pope's history of military service, his mental health problems, and his drug abuse -- indeed, every piece of this evidence was heard at some point by the trial jury. "Obviously, a petitioner cannot satisfy the prejudice prong of the Strickland test with evidence that is merely cumulative of evidence already presented at trial." Rose v. McNeil, 634 F.3d 1224, 1243 (11th Cir. 2011). Here, the available evidence in the state record is not merely cumulative -- it is largely the same evidence presented to the jury during the guilt phase. Because the jury heard this guilt-phase evidence, we cannot say that its repetition (or even its possible expansion) during the penalty phase would have changed the result with any reasonable probability, let alone that the Florida Supreme Court's determination on the point was an unreasonable one. See Evans v. Sec'y, Dep't of Corr., 703 F.3d 1316, 1342 (11th Cir. 2013) (recognizing that a penalty-phase jury was aware of evidence of aggravating factors elicited when the defendant testified during the guilt phase); Sochor v. Sec'y Dep't of Corr., 685 F.3d 1016, 1031 (11th Cir. 2012) (finding no prejudice in part because "[m]ost of the nonstatutory mitigating evidence that [petitioner] produced in the evidentiary hearing was cumulative of evidence produced at the guilt and penalty phases of the trial"); Glock v. Moore,

31

195 F.3d 625, 636 (11th Cir. 1999) (concluding that a capital petitioner could not show prejudice because "much of the new evidence that [petitioner] presents is merely . . . cumulative to that which was presented at trial").

As we've noted already, Dr. Weitz testified extensively during the guilt phase about Pope's mental condition at the time of the crime. Weitz explained his conclusion that Pope suffered post-traumatic stress disorder from his combat experience. Weitz stated that Pope's subsequent behavior was survivor-like, which stemmed from unusual trauma. And the jury heard from no mental health experts who contradicted Weitz's PTSD diagnosis.

Pope himself shed considerable light on his military background when he testified during the guilt phase. He too told the jury that he saw combat with the Marines in Vietnam, after which he had been honorably discharged, only to be heckled and ridiculed by protesters upon returning home. Pope's testimony also made the jury fully aware of his involvement in the use and sale of drugs. In fact, Pope described for the jury his use of cocaine and Quaaludes during the weekend of the murders. Other guilt-phase witnesses, including Eckard, attested to Pope's extensive history of drug abuse and involvement in drug dealing.

Aside from testimony actually presented to the jury in the guilt phase, the state record does not tell us in even the most general terms what mitigation evidence counsel could have put forward. When we "consider the totality of the

32

available mitigation evidence" in the state record, we see nothing new to "reweigh . . . against the evidence in aggravation." Porter v. McCollum, 558 U.S. 30, 41 (2008) (quoting Williams, 529 U.S. at 397-98). Adding together all of the aggravating and mitigating factors contained in the state record, then, we are hard pressed to find unreasonable the Florida Supreme Court's determination that there was no Strickland prejudice.

### C.

Nor can Pope show that he was prejudiced by Eber's failure to object to the prosecutor's comment about Pope's preference for the death penalty. Statements made by a prosecutor, implicitly backed by the authority of her office, can have a powerful effect on a jury. See Berger v. United States, 295 U.S. 78, 88 (1935); see also, e.g., United States v. Young, 470 U.S. 1, 7-8 (1985); Viereck v. United States, 318 U.S. 236, 248 (1943). In this case, however, whether or not counsel's failure to object to the prosecutor's comment about Pope's desire for the death penalty amounted to deficient performance, Pope has not established a reasonable probability that the outcome would have been different if counsel had objected to the prosecutor's remarks, let alone that the Florida Supreme Court's determination on this point was unreasonable.

In the first place, evidence of the defendant's preference for death over life was presented to the jury at Pope's trial on at least three other occasions. During

33

the guilt phase, the jury heard the testimony of Lieutenant Charles Hemp, an officer who went to North Carolina to arrest Pope and who interviewed him in the police station. During their conversation, Hemp told Pope that Eckard was not going to lie for him anymore and that it was time for Pope to tell the truth. Hemp testified that Pope then looked at him and said, "I'm going to be convicted. I don't care if they take my life." Then, during Eckard's testimony, she was presented with letters that Pope had written to her. These letters were introduced into the record as evidence. The prosecutor read exhibit 67 to Eckard; in this letter, Pope discussed the potential witnesses arrayed against him and said, "They will also, 'square me' with the death penalty, hoping I will take three life sentences instead of going to Court. Ha -- I'd rather be dead." And, in his closing argument at the penalty phase, defense counsel Eber said to the jury:

> Ladies and gentlemen, I will be brief. I want to let you know that Thomas Pope has specifically asked me not to get up and say anything to you. He maintains that he is innocent of committing these crimes. He doesn't want to beg you for mercy but I feel that it is my obligation to tell you why I think that the death penalty is not appropriate in this case. I will be very brief.

Because the jury otherwise heard at least three times about Pope's views on life and death and his specific choice, it seems remote indeed that a fourth statement by the prosecutor could have had much of an impact on their verdict, let alone the statement this prosecutor made. The prosecutor himself asked the jury not to consider Pope's preference to die. Though it does not make the comment proper,

34

the fact that the prosecutor's statement took the same form as a limiting instruction considerably softens any potentially negative impact.

In the second place, and significantly, the fact that the jury distinguished between a life-in-prison recommendation for the murders of Doranz and Di Russo and a death recommendation for the Walters killing strongly suggests that the prosecutor's comment had little if any effect on the jury.  In 1986, the Florida Supreme Court gave a reasoned rejection of Pope's second ineffectiveness claim on this basis, noting that the comment, "although clearly improper, in light of the aggravating evidence presented in connection with the murder of the female victim," was not "so egregious as to fundamentally undermine the reliability of the jury's recommendation."  Pope v. Wainwright, 496 So. 2d at 803 (footnote omitted).  The Florida Supreme Court explained that the mixed sentencing recommendations -- life for the killings of Doranz and Di Russo, death for Walters's murder -- "evidence that the jury properly weighed the aggravating and mitigating factors and did not blindly follow the petitioner's death wish even if they considered it."  Id.  By all accounts, the sentencing jury conducted a searching and individualized inquiry.  If indeed the prosecutor's comment was excessively explosive, influential, and prejudicial, one might have expected the jury to have recommended death for all three killings.  Yet they recommended the death penalty only for the murder of Kristine Walters, where the evidence of extensive

35

premeditation and the horrific nature of the homicide was particularly deplorable. We see no sign that the jury was swayed by the prosecutor's comment, particularly given the strength of the four aggravating factors. Again, the Florida Supreme Court's determination was not an unreasonable one.

In sum, Pope has presented two ineffectiveness claims, based on a failure to gather and present additional mitigating evidence and on the failure to object to the prosecutor's comment about Pope's preference for the death penalty. Whether we consider these claims alone or in concert, we are compelled to conclude that the Florida Supreme Court's determination was not contrary to or an unreasonable application of clearly established Supreme Court law. Florida's high court had ample reason to refuse relief on both of Pope's ineffectiveness claims. Pope has not met his considerable burden under § 2254(d). The district court erred in granting a writ of habeas corpus.

**REVERSED**.

36