[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 15-15068
_____

D.C. Docket No. 2:13-cv-00559-JES-CM

ANTON J. KRAWCZUK,

Petitioner-Appellant,

versus

SECRETARY, FLORIDA DEPARTMENT OF CORRECTIONS,

Respondent-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida
_____

(October 18, 2017)

Before HULL, WILLIAM PRYOR, and MARTIN, Circuit Judges.

HULL, Circuit Judge:

Florida death row inmate Anton Krawczuk appeals the district court's denial

of his 28 U.S.C. § 2254 petition for a writ of habeas corpus.  At issue is

Krawczuk's claim that his counsel rendered ineffective assistance in the investigation and presentation of mitigation evidence during his penalty phase proceedings. After review and with the benefit of oral argument, we conclude that the state court's denial of Krawczuk's ineffective trial counsel claim was not contrary to, or an unreasonable application of, clearly established federal law, nor was it based on an unreasonable determination of the facts. Accordingly, we affirm the district court's denial of Krawczuk's § 2254 petition.

## I. BACKGROUND

We first recount the evidence and procedural history.

### A.    Murder and Robbery

On September 12, 1990, Krawczuk and his roommate Billy Poirier brutally murdered and robbed David Staker. Krawczuk v. State, 634 So. 2d 1070, 1071 (Fla. 1994) ("Krawczuk I"). Both Krawczuk and Poirier, who shared a home in Lee County, Florida, were sexually involved with Staker during the months leading up to the murder. Id. Krawczuk and Poirier planned the murder and robbery three or four days in advance, arranging to carry out the crimes while visiting Staker at his home. Id.

The night of the murder, Krawczuk and Poirier went together to Staker's home. Id. They brought gloves with them to use while carrying out the murder and parked their vehicle some distance away from the victim's house. After the

2

three men watched television in the living room for twenty to thirty minutes, Krawczuk suggested that they go to the bedroom.  Id.

After a series of other events in the bedroom, Krawczuk retrieved his gloves, began acting aggressively, and proceeded to choke Staker with both hands.  Id. Meanwhile, Poirier assisted by holding Staker's mouth shut and pinching his nose closed.  Id.  Staker fought back and even tried to hit Krawczuk with a lamp, but Poirier was able to overtake Staker and wrestle the lamp away.  Id.  After almost ten minutes, Staker relented.  See id.  Believing that Staker might be "faking it," however, Krawczuk twice poured drain cleaner and water into Staker's mouth until it overflowed.  Id.  Poirier then stuffed a washcloth into Staker's mouth and covered it with tape.  Id.  Krawczuk then bound Staker's ankles, and the assailants deposited the body in the bathtub.  Id.  It was later determined that Staker died of asphyxia and strangulation.

In accordance with their established plan, Krawczuk and Poirier then stole a number of Staker's possessions, including television sets, stereo equipment, a video recorder, five rifles, and a pistol.  Id.  They loaded these items into Staker's pickup truck, along with Staker's body, and drove to the home of Gary Sigelmier, who bought some of the stolen items and agreed to store the rest.  Id. at 1071–72. Krawczuk and Poirer then loaded Staker's body into their own vehicle, abandoned Staker's pickup truck, and drove to a rural area, which Krawczuk had scouted

3

before the murder, to dump Staker's body.  Id. at 1072.  They discarded Staker's body in the woods and left.  Id.

## B.    Investigation, Confession, and Indictment

In the days following the murder, Staker's employer noticed that Staker had not shown up for work or picked up his paycheck.  Id. at 1071.  She went looking for Staker at his home, where she found the door open and what looked like the scene of a robbery.  Id.  She immediately contacted Lee County authorities.  Id.

On September 13, 1990, authorities found a body, later identified as Staker's, in a wooded area in Charlotte County, Florida.  Id.  Later that month, Sigelmier reported to the Charlotte County Sheriff's office that he bought property stolen from Staker's home and that he had acquired it from Krawczuk and Poirer. Id.

On September 18, 1990, sheriff's deputies from Lee County and Charlotte County went to Krawczuk and Poirer's home and took both men into custody.  Id. at 1071–72.  After waiving his rights under Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602 (1966), Krawczuk confessed to Staker's murder.  Krawczuk I, 634 So. 2d at 1072.

4

On October 3, 1990, a grand jury indicted Krawczuk and Poirier for (1) first degree premeditated murder, (2) first degree felony murder, and (3) robbery.[1]

## C.    LeGrande's Letter Regarding Aggravation and Mitigation

On March 8, 1991, Krawczuk's appointed trial counsel, Barbara LeGrande,[2] wrote a letter to Krawczuk explaining the importance of aggravating and mitigating circumstances in a capital case.  She informed Krawczuk that she had reviewed his military records and had provided them to Dr. Richard C. Keown, who conducted a psychiatric evaluation of Krawczuk.  In her letter, LeGrande included a list of all the statutory aggravating and mitigating factors that would be considered by the jury and judge in determining whether to sentence Krawczuk to death.

In her letter, LeGrande predicted the five aggravating factors the State would try to prove and evaluated the likelihood that the State would succeed in proving each one.  LeGrande identified five mitigating factors that she intended to prove on Krawczuk's behalf and explained that proving most of them would require Krawczuk to testify at trial.  She explained to Krawczuk that facts—including pre-planning the murder, pouring drain cleaner down the victim's throat, and hiding the body—would probably cause the jury to return a recommendation of death.

---

[1]Codefendant Poirier pled guilty to second degree murder in exchange for a sentence of thirty-five years' imprisonment.  Krawczuk I, 634 So. 2d at 1072 n.2.

[2]At the time of her representing Krawczuk, Counsel LeGrande had been appointed previously to seventeen capital cases.

**D.    Dr. Keown's Psychiatric Evaluation and Report**

During the pretrial proceedings, counsel LeGrande sought funds for a psychiatric evaluation to determine both Krawczuk's sanity at the time of the evaluation and his mental state at the time of Staker's murder.  The state trial court granted Krawczuk's motion and ordered an examination by Dr. Keown, who prepared a psychiatric report of his findings.

In his April 9, 1991 report, Dr. Keown summarized Krawczuk's brief history of mental health treatment.  When Krawczuk was eleven or twelve years old, he attended court-ordered counseling because of his tendency to get into trouble and run away from home.  Later, during his time serving as a United States Marine, Krawczuk was referred to a military psychiatrist because of Krawczuk's "apathetic and disinterested attitude about marine life, suicidal intentions, and conflicts with military life."  Dr. Keown's report noted that though the military psychiatrist identified no evidence of neurosis, psychosis, brain syndrome, or homicidal or suicidal thoughts, she did find that Krawczuk suffered from a mixed personality disorder and exhibited traits like immaturity, passive-aggressiveness, and anti-social personality patterns.  LeGrande had forwarded a copy of Krawczuk's military records to Dr. Keown.  Dr. Keown's report highlighted that Krawczuk was "of at least average intelligence with no significant cognitive deficits."

6

As to Krawczuk's family history, Dr. Keown noted that Krawczuk had no meaningful relationship with his father, that his mother was physically and verbally abusive, and that his stepfather often beat him. Krawczuk told Dr. Keown that his poor family life drove him to misbehavior, truancy, and even criminal activity.

While serving in the Marines, Krawczuk was (1) disciplined for fighting and misusing military equipment, (2) was court martialed for being away without leave, and (3) served six months in military confinement. Krawczuk eventually received an administrative separation from his military service. Krawczuk also explained to Dr. Keown that "he would rather have death than twenty-five years in jail" if he was found guilty.

Ultimately, Dr. Keown found that Krawczuk suffered from mild depressive symptoms but did not require medication. Dr. Keown concluded that Krawczuk was competent to stand trial and was sane at the time of Staker's murder. By May 8, 1991, Krawczuk had received Dr. Keown's report from LeGrande.

## E.    Pretrial Motion to Suppress Confession

On July 8, 1991, Krawczuk filed a motion to suppress his confession, which the state trial court denied. Id. The state trial court determined that Krawczuk's confession was admissible because it was given voluntarily after he was advised of, and waived, his Miranda rights. Id.

7

**F.    Change of Plea Hearing and Guilty Plea**

On September 27, 1991, Krawczuk informed the state trial court that he intended to plead guilty to all three counts in the indictment—first degree premeditated murder, first degree felony murder, and robbery—and requested the death penalty.  Id.  The state trial court held a hearing on Krawczuk's change of plea.

At the outset, Krawczuk informed the state trial court that he was prescribed Elavil because he became increasingly nervous in the days leading up to the trial and the medication had a calming effect to help him sleep.  Id. at 1073.  Krawczuk took this medication the day of the hearing, but he could not feel its effects and, at any rate, it did not prevent him from making a reasoned decision about his plea. Krawczuk stated that he otherwise had never suffered from mental illness before.

During the plea colloquy, Krawczuk indicated that he understood that an adjudication of guilt for murder could result in imposition of the death penalty. Krawczuk acknowledged his understanding that the proceedings would include a penalty phase to determine whether death would be an appropriate sentence.  The state trial court explained to Krawczuk that he was entitled to have a jury make this determination during the penalty phase and that the jury's recommendation carried great weight.

8

As to penalty phase proceedings, Krawczuk affirmed that he wished to waive the jury determination in favor of a determination by the state trial court and that he did not want to present any mitigating evidence. When asked why he intended to plead guilty and waive the opportunity to present mitigating evidence, Krawczuk answered that he "shouldn't be allowed to live for what [he] did."

At the plea hearing, the state trial court also addressed with Krawczuk whether he was satisfied with the representation of LeGrande. By a letter to the trial court dated April 29, 1991, Krawczuk had requested that LeGrande be dismissed and that he be appointed different counsel. Krawczuk reversed course at the hearing, however, stating that he was satisfied with LeGrande's representation and no longer wanted her removed. In addition, Krawczuk reported that he and LeGrande had fully discussed the implications of his guilty plea.

Before the plea hearing, LeGrande had filed a motion for funds to hire a mitigation expert, but Krawczuk dismissed that motion at the hearing. LeGrande explained that she had advised Krawczuk not to plead guilty and was prepared to present mitigating evidence. In particular, LeGrande planned to present the testimony of Dr. Keown and Paul Wise, Krawczuk's coworker, but Krawczuk instructed her not to. LeGrande intimated that she would present additional mitigating evidence, but she did not specify what evidence. LeGrande understood

9

that, under Florida law, it was Krawczuk's right to instruct her not to present mitigation evidence.

The state trial court found that Krawczuk was competent, determined that his guilty plea was entered freely and voluntarily, and adjudicated him guilty of first degree premeditated murder and robbery.

## G.    Krawczuk's Letter Following Sentencing Hearing

After the state trial court accepted his guilty plea, Krawczuk wrote a September 30, 1991 letter to LeGrande reiterating his desire to be sentenced to death and expressing hope that his guilty plea would help ensure his receiving the death penalty:

> As for my sentencing hearing, do you feel I can achieve my goal of receiving the death sentence? From the sounds of it, [the prosecutor] is very much for it as well, isn't he? By my pleading guilty to the charges, doesn't that increase the aggravating circumstances against me, and basically ensure my death penalty? After all, I am assisting the prosecution in their proving of my total guilt, aren't I?

In that same letter, Krawczuk lauded LeGrande's representation, stating:

> As far as I'm concerned, you have proven to be a shining example for a lawyer, and I have nothing but praise for you [and] your work. You have examined each and every aspect, as I have requested. In fact, I feel that you have done far more than was actually required. If I have put you in a bind by pleading guilty, it wasn't my intention. Thank you for remaining as my counsel, through this most critical of all phases.

10

## H.    Penalty Phase Proceedings

After Krawczuk's guilty plea, in a separate hearing on October 29, 1991, the State argued a penalty phase trial before a jury would be necessary despite Krawczuk's waiver.  The state trial court agreed and ordered a jury trial, which took place on February 4 and 5, 1992.

Before jury selection began, Krawczuk reiterated that he did not want LeGrande to participate in any part of the penalty phase trial, including selecting the jury, cross-examining the State's witnesses, presenting mitigation evidence, or making a closing argument.  LeGrande again explained that she had advised Krawczuk against this course of action.  When asked why he had chosen this course, Krawczuk replied: "Because I just feel basically twenty-five years as opposed to a death penalty is one in the same, either way you look at it, your life is gone."

Later this colloquy occurred:

THE COURT: It's my understanding from your remarks—and I don't want to put words in your mouth. But your response for taking this course of action, or one of the principal reasons is that the sentence of life with the minimum mandatory twenty-five years, um, is equally abhorrent and undesirable to you, as would be a death sentence. Would you consider them equivalent for your purposes?

MR. KRAWCZUK: Yes, Sir.

11

After extensive colloquy, the state trial court determined that Krawczuk was competent, that he understood the consequences of his decision, and that he was sufficiently intelligent to make this decision.

After a jury was impaneled, the State gave its opening statement. Neither LeGrande nor Krawczuk made any opening statement. The State then proceeded with its case.

The State's first witness was Staker's roommate, Charles Staub, who identified several of the items stolen on the night of the murder. The State then called Pete Sbabori, an investigator with the Charlotte County Sheriff's Office, who had helped identify Staker's body, had investigated the murder, and was present for Krawczuk's arrest.

Gary Sigelmier, the third witness, testified about how he met with Krawczuk and Poirier on the night of the murder and agreed to buy and store the items stolen from Staker's house. The State also presented the testimony of Ed Tamayo, a sergeant with the Lee County Sheriff's Office, who investigated the report that Staker was missing, recovered items stolen from Staker's house, and was present for Krawczuk's arrest.

Dr. R. H. Imani, the Medical Examiner for the District of Charlotte County, testified as an expert in forensic pathology. Dr. Imani performed the autopsy on Staker's body and determined that Staker died from asphyxia and strangulation.

12

The State then called Michael Savage, a detective with the Charlotte County Sheriff's Office, who helped investigate Staker's murder. Detective Savage was present when Krawczuk waived his Miranda rights and confessed to killing Staker.

In the jury's presence, the State played an audio tape of Krawczuk's confession, in which he explained in gruesome detail how he and Poirier pre-planned and carried out Staker's murder, robbed Staker's house, and disposed of Staker's body. During his confession, when asked why he was motivated to kill Staker, Krawczuk stated that he was "frustrate[ed] from the homosexual community that thrive[d]" where he lived and that he "wanted to exterminate it."

After the State rested and outside the presence of the jury, the state trial court again raised the issue of whether Krawczuk intended to present any mitigating evidence. Initially, Krawczuk indicated that he might allow the introduction of Dr. Keown's psychiatric report as mitigating evidence. LeGrande explained that Krawczuk was willing to do this not because he wished to avoid the death penalty but as a way of helping LeGrande discharge her duties as trial counsel and to prevent his death sentence being overturned on appeal.

The state trial court hinted that it was inclined to allow Dr. Keown's report to be admitted into evidence, but Krawczuk abruptly changed his mind and directed LeGrande not to introduce the report during his penalty phase case. Krawczuk then stated, as before, that he did not wish to present any mitigating

13

evidence or testify and that he was directing LeGrande not to make any closing argument. Once again, LeGrande represented that she had strongly advised Krawczuk against this course of action. Krawczuk also stated that he did not wish for the record to reflect the reasons for his decision due to their "very personal" nature.

As Krawczuk wished, the defense rested without presenting any evidence. After the State's final argument, the defense waived its opportunity to do the same. At the end of the penalty phase, the jury unanimously recommended the death penalty.

## I.    <u>Spencer</u> Hearing and Sentencing

On February 11, 1992, the state trial court held a hearing pursuant to <u>Spencer v. State</u>, 615 So. 2d 688 (Fla. 1993). LeGrande again stated that she intended to introduce Dr. Keown's psychiatric report as mitigation evidence, but Krawczuk directed her not to. Nonetheless, the state trial court indicated that, in making its sentencing determination, it would take into account both Dr. Keown's psychiatric report and the presentence investigation report. <u>Krawczuk I</u>, 634 So. 2d at 1072.

14

On February 13, 1992, the state trial court sentenced Krawczuk to death.[3] Id. Based on the evidence, the state trial court found three statutory aggravating factors: (1) the murder was committed in the course of a robbery or for pecuniary gain; (2) the murder was especially heinous, atrocious, or cruel; and (3) the murder was committed in a cold, calculated, and premeditated manner with no pretense of moral or legal justification. Upon consideration of the presentence investigation report and Dr. Keown's psychiatric report, the state trial court found one statutory mitigating factor: that Krawczuk had no significant history of prior criminal activity.

## J.    Direct Appeal

On direct appeal, the Florida Supreme Court affirmed Krawczuk's first-degree murder conviction and death sentence. Id. at 1074. The Florida Supreme Court concluded, inter alia, that sufficient evidence supported Krawczuk's murder conviction and that the state trial court adequately considered Dr. Keown's psychiatric report and the presentence investigation report in reaching its sentencing decision. Id. at 1073.

The United States Supreme Court denied Krawczuk's petition for writ of certiorari. Krawczuk v. Florida, 513 U.S. 881, 115 S. Ct. 216 (1994) (mem.).

---

[3]As to Krawczuk's robbery conviction, the state trial court sentenced Krawczuk to fifteen years' imprisonment.

15

## II.  STATE POSTCONVICTION PROCEEDINGS

On October 3, 1995, Krawczuk filed his initial motion for state postconviction relief under Rule 3.850 of the Florida Rules of Criminal Procedure.[4]  Krawczuk v. State, 92 So. 3d 195, 200 (Fla. 2012) ("Krawczuk II"). On March 15, 2002, Krawczuk filed an amended 3.850 motion raising twenty four claims.  Id.  After a hearing pursuant to Huff v. State, 622 So. 2d 982 (Fla. 1993), the state 3.850 court granted an evidentiary hearing on several issues, including the relevant Strickland issues.  At the hearing, Krawczuk asserted LeGrande should have developed and presented evidence to show: (1) his physically and emotionally abusive childhood; (2) his substance and alcohol abuse; (3) that he was a good worker at his maintenance job at McDonalds; (4) that he cooperated with authorities; (5) that he was under a mental or emotional disturbance at the time of the murder; and (6) that he was allowed to plead guilty to a lesser charge and receive only a prison sentence.  Id.  We summarize the extent of this evidence at the 3.850 hearing.

### A.    Family and Social Background

Krawczuk's twin brother, Christopher Krawczuk, testified about his and Krawczuk's difficult childhood.  They never had much of a relationship with their

---

[4]Krawczuk filed his postconviction motion prior to the adoption of Rule 3.851 of the Florida Rules of Criminal Procedure, which now governs postconviction motions filed by petitioners who have been sentenced to death.  See Fla. R. Crim. P. 3.851.

father, who left in their infancy.  Christopher had heard that their father was a heavy drinker who was often violent with their mother, Patricia.  For much of their childhood, the boys were raised by their mother, who was especially physically and verbally abusive toward Krawczuk and often doled out extreme punishments.  When Krawczuk got in trouble for playing with matches, for example, their mother Patricia once forced him to hold his hand over a lit gas stove burner.  She also used to strike the boys with the metal wand of a vacuum cleaner.  When Krawczuk soiled himself, their mother made him walk down the street wearing a sign reading, "I do my doodie in my pants every day."  LeGrande never contacted Christopher, but he would have been willing to testify.

Santo Calabro, who married Krawczuk's mother, also testified about Krawczuk's turbulent home life.  Calabro felt that Krawczuk's mother Patricia directed most of her anger toward Krawczuk and punished him more severely than her other children.  She not only denied Krawczuk her affection but also subjected him to violent beatings.  Although willing to testify, Calabro was never contacted.

Krawczuk's childhood friend, Todd Kaase, also witnessed the mother's violence to Krawczuk.  When Krawczuk was around fifteen or sixteen years old, he escaped his mother's abuse and lived full time with Kaase's family.  During the year Krawczuk lived with the Kaase family, Patricia never visited or even called to

17

check on Krawczuk.  Although never contacted, Kaase would have been willing to testify.

Krawczuk's mother Patricia also testified about Krawczuk's upbringing. She described Krawczuk's father as a "brutal man" who drank and beat her while she was pregnant with Krawczuk and Christopher.  Patricia was verbally and physically abusive toward all her children, but especially toward Krawczuk because he was an unaffectionate and difficult child.  Patricia tried to show him love and affection, but Krawczuk was "aloof."

Patricia had a hard time dealing with Krawczuk's misbehavior.  When Krawczuk was only fifteen or sixteen years old, for instance, he was arrested for stealing cars and spent time in a youth detention facility.  Patricia beat Krawczuk as a way of disciplining him for his "incorrigible" behavior.

When Patricia found out that Krawczuk was in jail for Staker's murder, she called LeGrande about visiting him.  LeGrande seemed surprised to hear from Patricia and never contacted her again regarding Krawczuk's penalty phase trial. Patricia was unsure whether she would have testified during Krawczuk's penalty phase, but she at least would have been willing to talk to LeGrande.

Paul Wise, Krawczuk's former coworker and roommate, testified that Krawczuk was a hard worker but was often moody and occasionally used marijuana.  Socially, Wise described Krawczuk as loner and a "follower."

18

Judith Nelson, Krawczuk's former wife, testified that she and Krawczuk married in 1986, had one child together, and divorced after about a year and a half of marriage. While he was married to Nelson, Krawczuk used marijuana on a daily basis and occasionally took speed. Krawczuk was not very affectionate and had a hard time communicating with her, but Krawczuk also had a good side and at times she enjoyed his company.

Krawczuk told Nelson about the issues he faced during his childhood, including his mother Patricia's abusive behavior. Nelson had a positive relationship with Patricia during her marriage to Krawczuk, but things turned sour after the divorce when Nelson decided to remarry.

Nelson did not think highly of Poirier, Krawczuk's codefendant. Poirier and Krawczuk spent a lot of time together, and Nelson eventually learned that they spent some of this time "doing sex swap things" and burglarizing homes. Although Nelson testified that Poirier always emulated Krawczuk's behavior, she felt that Poirier had more influence in their friendship and was the one who organized their criminal activity.

**B.    Mental Health Experts**

During the 3.850 hearing, Krawczuk also presented the testimony of two mental health experts:  Dr. Barry Crown and Dr. Faye Sultan.

19

Dr. Crown, a psychologist, testified as an expert in neuropsychology with a special focus on child abuse and drug addiction. Dr. Crown interviewed Krawczuk and administered neuropsychological tests to determine the relationship between his brain function and behavior. Dr. Crown did not review any background materials or previous psychiatric information before evaluating Krawczuk.

Based on his evaluation, Dr. Crown found that Krawczuk had normal intellectual functioning but poor intellectual efficiency, with the critical thinking skills of a ten-year-old and the mental processing skills of a thirteen-year-old. Dr. Crown also found that Krawczuk showed signs of organic brain damage, which was likely related to developmental issues and was aggravated by head trauma and drug and alcohol use. As to statutory mitigators, Dr. Crown opined that at the time of Staker's murder, Krawczuk was under the influence of an extreme mental or emotional disturbance and lacked the capacity to conform his conduct to the requirements of the law.

Dr. Sultan, also a psychologist, testified as an expert in the field of clinical psychology with a focus on the assessment and treatment of victims of abuse. Dr. Sultan met with Krawczuk on seven separate occasions, conducted formal psychological testing, reviewed background materials provided by Krawczuk's postconviction counsel, reviewed Dr. Crown's neuropsychological report, and spoke with several of Krawczuk's family members and friends.

20

Through her background research, Dr. Sultan learned that Krawczuk suffered severe childhood abuse and frequently ran away from home. Krawczuk told Dr. Sultan that, when he was fifteen or sixteen years old, he was briefly abducted, sexually abused, and beaten by a group of strangers. Dr. Sultan diagnosed Krawczuk with a general cognitive disorder, obsessive-compulsive disorder, and a general personality disorder. Dr. Sultan described Krawczuk as a passive person who was easily influenced and exhibited traits consistent with antisocial personality disorder.

Like Dr. Crown, Dr. Sultan determined that two statutory mitigating factors applied at the time of Staker's murder: Krawczuk was under the influence of an extreme mental or emotional disturbance and he was unable to conform his conduct to the requirements of the law. As to non-statutory mitigators, Dr. Sultan found it relevant that Krawczuk: (1) was abandoned by his father; (2) was isolated during childhood; (3) was not supervised during his childhood; (4) sustained neuropsychological damage; (5) had mental disorders; (6) endured emotional and physical abuse; (7) experienced depressive symptoms; and (8) suffered sexual abuse.

When asked about Krawczuk's decision not to present mitigating evidence at the penalty phase, Dr. Sultan opined that Krawczuk's mental disorders likely influenced this decision. Dr. Sultan also felt, however, that Krawczuk's thinking

21

was not impaired by Elavil, the antidepressant medication he was taking at the time of his plea hearing.

## C.    Barbara LeGrande

Trial counsel LeGrande testified about her representation of Krawczuk. LeGrande recalled that Krawczuk asked her not to present mitigation evidence and it was her understanding that Krawczuk was entitled to make that decision on his own.  At the time Krawczuk made this decision, LeGrande did not put on the record the full list of witnesses and experts she would have called in mitigation.

As to her investigation of mitigating evidence, LeGrande explained that she had done little mitigation research in advance of the plea hearing.  Other than obtaining a psychiatric evaluation and report from Dr. Keown, LeGrande did not try to find other expert witnesses.  LeGrande spoke briefly with Krawczuk's mother and grandmother, but she could not recall the content of these conversations.  LeGrande tried to gather more information about Krawczuk's family so that she could talk with them, but stated Krawczuk was not cooperative with this effort and wanted to leave his family out of it.

LeGrande explained that, had Krawczuk allowed her to present a case at the penalty phase, she would have engaged in further investigation of mitigating evidence, including hiring experts and looking into other potential witnesses. LeGrande tried to hire a mitigation expert to assist in this process, but at the plea

22

hearing, Krawczuk dismissed her motion for expert funds.  In light of Krawczuk's stated desire not to present a penalty phase case, LeGrande felt that she could not "in good faith . . . represent to the Court that [she] needed a mitigation expert."

LeGrande acknowledged that Poirier's relative culpability for the murder and influence over Krawczuk were relevant to Krawczuk's penalty phase proceedings.  In fact, she discussed with Krawczuk the possibility of his taking the stand to testify that Poirier had influenced him to participate in the murder.  But because Krawczuk was unwilling to testify at the penalty phase proceedings, she did not discuss this relative culpability issue with Krawczuk in great detail.  At any rate, because Poirier pled guilty to the murder months after Krawczuk pled guilty, LeGrande had no way of knowing at the time of Krawczuk's penalty phase whether Poirier would receive a sentence that was proportional to his culpability and thus had no reason to explore this issue as it related to mitigation.

Ultimately, because Krawczuk did not wish to make a case at the penalty phase, LeGrande was unable to explain to Krawczuk the details of what mitigating evidence might have been presented on his behalf.  Instead, she could only provide Krawczuk with a general conceptual explanation of mitigating evidence and how it might help him avoid the death penalty.

23

### D.    State's Evidence

For its part, the State introduced two exhibits.  First, the State introduced the psychiatric report of Dr. Robert J. Wald, who performed a psychiatric evaluation to determine whether Krawczuk was competent to testify as a witness in codefendant Poirier's criminal case.  Dr. Wald examined Krawczuk in March 1992, after the state trial court sentenced Krawczuk to death.

Dr. Wald found that Krawczuk's intelligence was normal or slightly above and that he exhibited no signs of hallucinations, delusional thinking, paranoia, or suicidal or homicidal thoughts.  Krawczuk told Dr. Wald that he felt the punishment he received fit the crime for which he was convicted and that he stood to gain nothing by testifying against Poirier.  Dr. Wald concluded that Krawczuk was competent to testify in Poirier's criminal proceedings.

Second, the State introduced into evidence the transcript of a deposition given by Dr. Keown.  Among other things, Dr. Keown stated that, during his meeting with him, Krawczuk emphasized that Poirier led the effort to rob and kill Staker and that he was merely a follower.  In Dr. Keown's clinical opinion, Krawczuk was "overstating" Poirier's influence over him.

## III.  STATE POSTCONVICTION COURT'S DENIAL OF 3.850 MOTION

In a comprehensive order dated January 25, 2010, the state postconviction court denied Krawczuk's 3.850 motion for postconviction relief.  As relevant to

24

this appeal, the state 3.850 court rejected Krawczuk's claim that LeGrande rendered ineffective assistance in the investigation and presentation of mitigating evidence.

At the outset, the state 3.850 court found the testimony of Krawczuk's two mental health experts—Dr. Crown and Dr. Sultan—to be incredible. As to Dr. Crown's conclusions that, at the time of the murder, Krawczuk was under the influence of an extreme mental or emotional disturbance and was unable to conform his conduct to the requirements of the law, the state 3.850 court found that the weight of the evidence so strongly refuted this claim as to render it incredible:

> [T]he other evidence including, particularly, Mr. Krawczuk's confession but also including Mr. Krawczuk's letters, the statement and deposition of Gary Sigelmier, the statement of Mr. Poirier, the testimony of the family members and friends, the other mental health professionals, reports and depositions, and other credible evidence in this case so resoundingly refute this opinion as to discredit [it] as well the related opinion that Mr. Krawczuk suffers from organic brain damage.

The state 3.850 court also rejected Dr. Sultan's conclusions that Krawczuk was under the influence of an extreme mental or emotional disturbance and was unable to conform his conduct to the requirements of the law. Although Dr. Sultan testified that she relied extensively on Dr. Crown's evaluations in reaching her own conclusions, the record shows that Dr. Sultan's last meeting with Krawczuk occurred well before Dr. Crown evaluated him. The state 3.850 court also found

25

that Dr. Sultan's conclusions were contrary to the weight of the evidence, which strongly indicated that these statutory mitigating factors did not apply.

## A. Krawczuk's Legitimate Waiver

Regarding Krawczuk's decision not to present a penalty phase case, the state 3.850 court recognized that under Florida law, "[a] competent defendant may waive presentation of mitigation evidence." See Hojan v. State, 3 So. 3d 1204, 1211 (Fla. 2009) ("Competent defendants who are represented by counsel maintain the right to make choices in respect to their attorneys' handling of their cases. This includes the right to either waive presentation of mitigation evidence or to choose what mitigation evidence is introduced by counsel."). Florida law also provides that, where a defendant seeks to waive the presentation of evidence against the advice of counsel, counsel must inform the trial court on the record of the defendant's decision and indicate what mitigation evidence, if any, is available to be presented. Koon v. Dugger, 619 So. 2d 246, 250 (Fla. 1993). The trial court must then require the defendant to confirm on the record that his counsel had discussed these matters with him and that he nonetheless intended to waive the presentation of mitigation evidence. Id.

The state 3.850 court explained, however, that Koon was decided after Krawczuk's sentencing hearing in February 1992 and thus did not bind LeGrande during her representation. In any event, the state 3.850 court noted that the rule

26

announced in <u>Koon</u> is a creature of state law only and that this procedure likely is not required as a matter of federal law.  See <u>Anderson v. Sec'y, Dep't of Corr.</u>, 462 F.3d 1319, 1330–31 (11th Cir. 2006) ("Although <u>Koon</u> requires counsel to state on the record what the evidence in mitigation would be . . . , '[a] state's interpretation of its own laws or rules provides no basis for federal habeas corpus relief, since no question of constitutional nature is involved.'" (second alteration in original) (citing <u>McCullough v. Singletary</u>, 967 F.2d 530, 535 (11th Cir. 1992))).  It further found that Krawczuk was and is mentally competent and validly waived the presentation of mitigation evidence, stating:

> at the time of this case no particular form of record inquiry was required for a defendant to waive mitigation (waive the presentation of evidence) and as it is not subject of serious dispute that Mr. Krawczuk was, and is, a mentally competent man . . . who was counseled by his attorney and asked and inquired of by the court and the prosecutor on multiple occasions . . . regarding his decision to waive mitigation[,] the basics [sic] requirements for a valid record waiver as they existed at the time of this case have been met.

## B. Ineffective Counsel

Turning to Krawczuk's ineffective counsel claim, the state 3.850 court discussed the legal principles in <u>Strickland v. Washington</u>, 466 U.S. 668, 104 S. Ct. 2052 (1984).  It noted that <u>Strickland</u> requires the petitioner to show both that counsel's performance was deficient under the then-prevailing professional norms and that petitioner's case was prejudiced such that, but for counsel's alleged errors, the result of the proceedings would have been different.

27

As to counsel's performance, the state 3.850 court analyzed LeGrande's representation with respect to her investigation of several mitigation factors. Regarding family and background evidence, it found that before Krawczuk pled guilty, LeGrande had prepared two mitigation witnesses and that Krawczuk "appear[ed] . . . reasonably aware of what [they] would testify to." It also found that at the point of entering his plea, Krawczuk "was not just passively not cooperating with any investigation for mitigation but he was active in directing his counsel not to pursue mitigation."

The state 3.850 court stated that the "only excuse that [would] be recognized for failing to investigate family background for mitigation [was] direct unequivocal instructions from the client not to." It determined that LeGrande's performance was deficient for failing to investigate Krawczuk's family history and failing to obtain clear directions from Krawczuk not to pursue family history, stating:

> [a]lthough it is probable that given Mr. Krawczuk's position counsel acted reasonably in discontinuing an investigation into his family history the case law is extremely compelling on the need for an unequivocal expression from a defendant not to pursue this type of information. Permitting an investigation for mitigation and refusing to allow presentation of mitigation are closely related but different. In this case the record will not support the unequivocal direction to not investigate the court believes [was] required by the law as it existed at the time in question.

28

As to all other aspects of LeGrande's investigation—including relative culpability, substance abuse, work ethic, and mental health—the state 3.850 court found no deficiencies in LeGrande's representation.

As to Strickland prejudice, the state 3.850 court outlined the requirements to establish prejudice where a defendant, like Krawczuk, waived the presentation of mitigating evidence. In such circumstances, the state 3.850 court found that the Krawczuk must make three showings: (1) that, had trial counsel conducted a reasonable investigation, she would have discovered mitigating evidence; (2) a reasonable probability that, if he had been advised more fully of the available mitigation evidence, the petitioner would have instructed trial counsel to present the evidence at the penalty phase; and (3) a reasonable probability that, had the available mitigation evidence been presented, the jury would have recommended a life sentence.

As to the first showing, the state 3.850 court determined that obtaining physical and emotional abuse evidence from Krawczuk's childhood would have been difficult, although not impossible, for LeGrande. Specifically, it noted that this would have required LeGrande to "rely on Mr. Krawczuk and[,] given his expressed desire not to involve his family[,] that most likely would have been a dead end." However, "on this record" it could not find that the evidence of family history would not have been "discovered had counsel done a reasonable

29

investigation." It found that all other evidence of mitigation was known to, developed by, or unhelpful for LeGrande.

As to the second showing, the state 3.850 court found that Krawczuk had not shown "a reasonable probability that if he had been more fully advised about the potential mitigation evidence[,] he would have authorized trial counsel to present such evidence at either the penalty phase trial or at the Spencer hearing." It noted that "[p]robably the best indication of how Mr. Krawczuk would have treated other mitigation was how he treated the known mitigation." Namely, Krawczuk was aware of some available mitigating evidence, including Dr. Keown's report and Paul Wise's testimony, but directed LeGrande not to develop it and, after initially conceding admission of Dr. Keown's report, commanded her not to present any mitigation evidence at the penalty phase.

In support of his desire not to present mitigation evidence, Krawczuk "indicated he had personal reasons . . . [that he] did not want to put . . . on the record." Likewise, his original acquiescence to introducing Dr. Keown's report was "not a desire that mitigation be considered but that a death sentence not be reversed for a failure to present mitigation." As additional evidence of his steadfast conviction, Krawczuk waived all of his defensive motions, including LeGrande's motion for a mitigation specialist. In light of the firmness with which Krawczuk insisted that LeGrande not present a case at the penalty phase, the state

30

3.850 court determined that the discovery of more evidence would not have changed Krawczuk's decision.

As to the third showing, whether Krawczuk established a reasonable probability that the new mitigating evidence would have changed the outcome of the proceedings, the state 3.850 court balanced the aggravating and mitigating evidence. It found that the State had proven these aggravating factors beyond a reasonable doubt: (1) the murder was committed during a robbery and for pecuniary gain; (2) the murder was especially heinous, atrocious, or cruel; and (3) the murder was cold, calculated, and premeditated without any pretense of moral or legal justification. Though the state 3.850 court found no statutory mitigating factors, it did find these non-statutory mitigators: (1) Krawczuk endured an abusive childhood; (2) Poirier received a lesser sentence; (3) Krawczuk had a history of drug and alcohol use; (4) Krawczuk was a hard-working employee; (5) Krawczuk had a less-than-extreme mental or emotional disturbance; and (6) Krawczuk cooperated with law enforcement.

Weighing these factors, the state 3.850 court determined that Krawczuk failed to show a reasonable probability that, had the additional mitigating evidence adduced at the postconviction hearing been presented at the penalty phase, the proceedings would have resulted in a sentence of life imprisonment. It noted twice

31

its confidence "beyond a reasonable doubt that a sentence of death would have been the result regardless."

## IV. FLORIDA SUPREME COURT AFFIRMS DENIAL OF 3.850 MOTION

On appeal, the Florida Supreme Court affirmed the state postconviction court's denial of Krawczuk's 3.850 motion for postconviction relief.[5]  Krawczuk II, 92 So. 3d at 209.  As to Krawczuk's claim that LeGrande rendered ineffective assistance of counsel in the investigation and presentation of mitigation evidence, the Florida Supreme Court concluded that the state 3.850 court properly denied this claim.  Id. at 203.

Before addressing the merits of this claim, the Florida Supreme Court correctly identified the principles governing ineffective assistance of counsel claims.  The Florida Supreme Court explained that, to succeed on such a claim, the petitioner must show both deficiency and prejudice:

> First, the claimant must identify particular acts or omissions of the lawyer that are shown to be outside the broad range of reasonably competent performance under prevailing professional standards. Second, the clear, substantial deficiency shown must further be demonstrated to have so affected the fairness and reliability of the proceeding that confidence in the outcome is undermined.

Id. at 202 (quoting Bolin v. State, 41 So. 3d 151, 155 (Fla. 2010)).

---

[5]Krawczuk also filed with the Florida Supreme Court a petition for a writ of habeas corpus, which it denied.  Krawczuk II, 92 So. 3d at 209.  Though this habeas petition included an ineffective counsel claim, it related only to his appellate counsel's failure to raise on direct appeal the issue of disparate treatment.  Id. at 208.

32

## A. Performance

The Florida Supreme Court also explained what is required to show that

counsel's performance was deficient, stating:

> There is a strong presumption that trial counsel's performance was not deficient. See Strickland, 466 U.S. at 690, 104 S.Ct. 2052. "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Id. at 689, 104 S.Ct. 2052. The defendant carries the burden to "overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" Id. (quoting Michel v. Louisiana, 350 U.S. 91, 101, 76 S.Ct. 158, 100 L.Ed. 83 (1955)). "Judicial scrutiny of counsel's performance must be highly deferential." Id. "[S]trategic decisions do not constitute ineffective assistance of counsel if alternative courses have been considered and rejected and counsel's decision was reasonable under the norms of professional conduct." Occhicone v. State, 768 So.2d 1037, 1048 (Fla. 2000).

Id. at 202–03 (quoting Johnson v. State, 63 So. 3d 730, 737 (Fla. 2011)).

Regarding counsel's obligation to investigate and prepare mitigating

evidence, the Florida Supreme Court explained that assessment of the

reasonableness of counsel's investigation must include "a context-dependent

consideration of the challenged conduct" from counsel's perspective, stating:

> [O]ur principal concern in deciding whether [counsel] exercised "reasonable professional judgmen[t]" is not whether counsel should have presented a mitigation case. Rather, we focus on whether the investigation supporting counsel's decision not to introduce mitigating evidence . . . was itself reasonable. In assessing counsel's investigation, we must conduct an objective review of their performance, measured for "reasonableness under prevailing professional norms," which includes a context-

33

dependent consideration of the challenged conduct as see[n] "from counsel's perspective at the time."

Id. at 203 (quoting Orme v. State, 896 So. 2d 725, 731 (Fla. 2005)).

The Florida Supreme Court noted that, in cases like Krawczuk's where the defendant instructs counsel not to present mitigating evidence, "trial counsel could not be deemed ineffective for following their client's wishes not to present mitigation." Id. at 205; Brown v. State, 894 So.2d 137, 146 (Fla. 2004) ("An attorney will not be deemed ineffective for honoring his client's wishes."). At the outset of its decision, the Florida Supreme Court set forth some of the findings that the Florida Supreme Court had affirmed on direct appeal. As to those findings, the Florida Supreme Court noted in particular: that Krawczuk "informed the court that [he] wished to waive the penalty proceeding," that he "forbade [his counsel] from presenting evidence on his behalf" during the penalty phase, and that he "refused to allow counsel to present" the evidence of his family history, which was available from Dr. Keown's report. Krawczuk II, 92 So.3d at 199, 205.

The Florida Supreme Court also stated that "the record demonstrates that Krawczuk would not permit his attorney to involve his family." Id. at 205. It stated that "counsel's ability was limited by the defendant's desire not to include his family." Id. As a result, the Florida Supreme Court

34

concluded that "counsel's actions could not be deemed ineffective." Id. (citing Brown, 894 S.2d at 146). Thus, the Florida Supreme Court did not agree with the 3.850 court that trial counsel's performance was deficient as to family history.

## B. Prejudice

The Florida Supreme Court also found that Krawczuk had not established prejudice. Although there was significant mitigation evidence available that LeGrande did not discover, the Florida Supreme Court concluded that it was "equally clear that Krawczuk repeatedly insisted that counsel not pursue mitigation and not involve his family." Id. The Florida Supreme Court stated that "the postconviction court found that the information that would have been presented by the family was available through Dr. Keown's report, which Krawczuk also refused to allow counsel to present" and that "[b]ecause of Krawczuk's instructions to counsel not to involve his family, we find that Krawczuk cannot establish prejudice." Id.

In other words, Krawczuk had Dr. Keown's report, which discussed his childhood abuse and family history, but Krawczuk had refused to allow LeGrande to present even this evidence. Thus, the Florida Supreme Court determined that Krawczuk could not establish the requisite prejudice to succeed on this claim about LeGrande's investigation and presentation of

35

mitigating evidence.  Id.  The Florida Supreme Court did not address the state 3.850 court's alternative conclusion that all the additional mitigation evidence, even if introduced at trial, would not have led to a different sentence.  See id.

## V.  FEDERAL HABEAS PROCEEDINGS

On July 18, 2013, Krawczuk filed a petition in the United States District Court for the Middle District of Florida seeking a writ of habeas corpus under 28 U.S.C. § 2254.  The petition asserted four claims, including that LeGrande rendered ineffective assistance of counsel in the investigation and presentation of mitigating evidence.

On August 15, 2015, the district court denied Krawczuk's habeas petition in its entirety, including this ineffective counsel claim.  The district court did not discuss whether LeGrande's performance was deficient and addressed only prejudice.[6]  After reviewing the state courts' decisions and all of the evidence, the district court concluded that Krawczuk had not established prejudice because (1) "[t]he state court reasonably concluded that [Krawczuk] gave LeGrande unmistakable instructions not to present mitigation evidence" and (2) "[n]othing in the record suggests that [Krawczuk] would have changed his directions to counsel

---

[6]See Strickland, 466 U.S. at 697, 104 S. Ct. at 2069 (holding that a court deciding a claim of ineffective assistance of counsel need not decide the issue of deficiency if the claim can be disposed of solely on the basis of lack of prejudice).

had he been more full informed about mitigating evidence." The district court pointed out that Krawczuk offered no evidence during the postconviction proceedings indicating that, had he been made aware of all mitigating evidence, he would have instructed counsel differently.

Accordingly, because the Florida Supreme Court had a reasonable basis to deny Krawczuk relief, the district court denied Krawczuk's ineffective counsel claim. It also denied Krawczuk a certificate of appealability ("COA"). Krawczuk timely filed a notice of appeal.

This Court granted Krawczuk a COA as to one issue: "Whether the Florida state courts' ruling that counsel provided constitutionally effective assistance in investigating and presenting mitigation evidence at the penalty phase hearing was contrary to or an unreasonable application of clearly established federal law, or was based on an unreasonable determination of the facts in light of the evidence presented."[7]

## VI. STANDARD OF REVIEW

Under 28 U.S.C. § 2254, as amended by the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), our review is limited. A federal court may only grant a writ of habeas corpus to a state prisoner on a claim adjudicated on the

---

[7]To the extent that Krawczuk's brief argues that he was denied competent and independent mental health assistance under Ake v. Oklahoma, 470 U.S. 68, 105 S. Ct. 1087 (1985), such a claim is outside the scope of the COA and we do not address it. See Rivers v. United States, 777 F.3d 1306, 1308 n.1 (11th Cir. 2015).

merits in a state court where the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

A state court's decision rises to the level of an unreasonable application of federal law only where the ruling is "objectively unreasonable, not merely wrong; even clear error will not suffice."  Virginia v. LeBlanc, 582 U.S. __, __, 137 S. Ct. 1726, 1728 (2017) (per curiam) (quoting Woods v. Donald, 575 U.S. __, __, 135 S. Ct. 1372, 1376 (2015) (per curiam)).  This standard is "meant to be" a difficult one to meet.  Harrington v. Richter, 562 U.S. 86, 102, 131 S. Ct. 770, 786 (2011). AEDPA thus "imposes a highly deferential standard for evaluating state-court rulings and demands that state-court decisions be given the benefit of the doubt." Trepal v. Sec'y, Fla. Dep't of Corr., 684 F.3d 1088, 1107 (11th Cir. 2012) (quoting Hardy v. Cross, 565 U.S. 65, 66, 132 S. Ct. 490, 491 (2011) (per curiam)). Because we review Krawczuk's ineffective assistance claim through the lenses of both Strickland and AEDPA, our analysis is "doubly" deferential.  Harrington, 562 U.S. at 105, 131 S. Ct. at 788.

Pursuant to AEDPA, we may only grant relief where the state court's ruling contained an error so clear that fair-minded people could not disagree about it.

38

Wright v. Sec'y, Fla. Dep't of Corr., 761 F.3d 1256, 1277 (11th Cir. 2014). "We review de novo the district court's decision about whether the state court acted contrary to clearly established federal law, unreasonably applied federal law, or made an unreasonable determination of fact." Trepal, 684 F.3d at 1107 (quoting Johnson v. Upton, 615 F.3d 1318, 1330 (11th Cir. 2010)).

## VII.  **STRICKLAND PRINCIPLES**

On appeal, Krawczuk contends that the Florida Supreme Court unreasonably applied Strickland and its progeny and made unreasonable factual determinations in denying his ineffective counsel claim as to LeGrande's investigation and presentation of mitigation evidence.  Under Strickland, Krawczuk must show (1) that his attorney's performance was deficient and (2) that this deficient performance prejudiced his defense.  466 U.S. at 687, 104 S. Ct. at 2064.  We discuss these Strickland principles with emphasis on decisions where a defendant instructed counsel not to present mitigation evidence.

### A. Performance

In determining whether counsel's performance was deficient, we ask whether counsel exhibited "objectively reasonable attorney conduct under prevailing professional norms." Pooler v. Sec'y, Fla. Dep't of Corr., 702 F.3d 1252, 1269 (11th Cir. 2012) (quoting Johnson v. Upton, 615 F.3d 1318, 1330 (11th Cir. 2010)).  The relevant inquiry is "whether, in light of all the circumstances, the

39

identified acts or omissions were outside the wide range of professionally competent assistance." Strickland, 466 U.S. at 690, 104 S. Ct. at 2066. We must "indulge a strong presumption" that counsel exercised reasonable professional judgment. Pooler, 702 F.3d at 1269 (quoting Rhode v. Hall, 582 F.3d 1273, 1280 (11th Cir. 2009)).

In death penalty cases, trial counsel is obliged to investigate and prepare mitigation evidence for his client. See Porter v. McCollum, 558 U.S. 30, 39–40, 130 S. Ct. 447, 453 (2009). Because the attorney acts based on information he receives from the defendant, however, whether counsel acted reasonably depends in part on the actions or statements of the defendant. See Strickland, 466 U.S. at 691, 104 S. Ct. at 2066 ("The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions."). Thus, "'what investigation decisions are reasonable depends critically' upon the information the defendant furnishes to his counsel." Pooler, 702 F.3d at 1269 (quoting Strickland, 466 U.S. at 691, 104 S. Ct. at 2066). "[T]he scope of the duty to investigate mitigation evidence is substantially affected by defendant's actions, statements, and instructions." Cummings v. Sec'y, Dep't of Corr., 588 F.3d 1331, 1357 (11th Cir. 2009).

When a competent defendant clearly instructs counsel either not to investigate or not to present any mitigating evidence, "the scope of counsel's duty

40

to investigate is significantly more limited than in the ordinary case." Id. at 1358–59. This Court has recognized, and we now hold, that "the duty to investigate 'does not include a requirement to disregard a mentally competent client's sincere and specific instructions about an area of defense and to obtain a court order in defiance of his wishes.'" Id. at 1357 (quoting Rutherford v. Crosby, 385 F.3d 1300, 1313 (11th Cir. 2004)); see Blankenship v. Hall, 542 F.3d 1253, 1277 (11th Cir. 2008) ("Significant deference is owed to failures to investigate made under a client's specific instructions not to involve his family."); Newland v. Hall, 527 F.3d 1162, 1202 (11th Cir. 2008) ("We have also emphasized the importance of a mentally competent client's instructions in our analysis of defense counsel's investigative performance under the Sixth Amendment.").

## B. Prejudice

To establish prejudice, the defendant must show that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694, 104 S. Ct. at 2068. When deciding whether the defendant has shown prejudice, we must "evaluate the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding," and reweigh it with the aggravating evidence. Williams v. Taylor, 529 U.S. 362, 397–98, 120 S. Ct. 1495, 1515 (2000).

41

However, "[a] competent defendant's clear instruction not to investigate or present mitigation evidence also impacts the prejudice prong of the ineffective assistance test." Cummings, 588 F.3d at 1359. If the defendant affirmatively "instructed his counsel not to offer any mitigating evidence," then "counsel's failure to investigate further could not have been prejudicial under Strickland." Schriro v. Landrigan, 550 U.S. 465, 475, 127 S. Ct. 1933, 1941 (2009).

Rather, to establish Strickland prejudice after instructing counsel not to present mitigating evidence at trial, we hold that a capital defendant must satisfy two requirements: (1) establish a reasonable probability that, had he been more fully advised about the available mitigation evidence, he would have allowed trial counsel to present that evidence at the penalty phase; and (2) establish a reasonable probability that, if such evidence had been presented at the penalty phase, the jury would have concluded that the balance of the aggravating and mitigating factors did not warrant the death penalty. Landrigan, 550 U.S. at 481, 127 S. Ct. at 1944; see Pope v. Sec'y, Fla. Dep't of Corr., 752 F.3d 1254, 1266 (11th Cir. 2014) (concluding that a capital defendant who instructs his counsel not to present mitigating evidence must satisfy these two requirements to show prejudice); Gilreath, 234 F.3d at 551–52 (adopting these two requirements even before the Landrigan decision). The defendant bears the burden of establishing both elements. Strickland, 466 U.S. at 696, 104 S. Ct. at 2069; Pope, 752 F.3d at 1267.

42

We now apply these <u>Strickland</u> and <u>Landrigan</u> principles, which in Krawczuk's case begins and ends with prejudice.  <u>Strickland</u>, 466 U.S. at 697, 104 S. Ct. at 2052 ("If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed.").

## C. The Florida Supreme Court Reasonably Determined Krawczuk Instructed LeGrande Not to Present Mitigating Evidence

Krawczuk's instructions to his counsel regarding the penalty phase are pivotal to our prejudice analysis.  We explain why the Florida Supreme Court reasonably determined that Krawczuk instructed his counsel not to present mitigating evidence.

The record evidence overwhelmingly supports the state court's decision. For starters, at three separate judicial proceedings, Krawczuk repeatedly insisted that he did not want mitigation evidence presented.  For example, at his plea hearing, Krawczuk clearly communicated his desire not to present mitigating evidence and affirmatively dismissed his counsel's motion for funds to hire a mitigation expert.  At that same hearing, LeGrande stated that Krawczuk had instructed her not to present mitigating evidence despite her strong advice to the contrary.  LeGrande told the court she had prepared two mitigation witnesses but Krawczuk had forbidden her to call these witnesses and was "thwarting [her] efforts to defend [him] in the way [she felt was] necessary."  The state trial court was convinced that Krawczuk was competent during this hearing.

43

At this time, Krawczuk had Dr. Keown's report that contained details of Krawczuk's abusive childhood, military psychiatric report, and past encounters with the law. LeGrande informed the court she had told Krawczuk that she believed it was in his best interest to call Dr. Keown but Krawczuk had commanded her not to call him.

After the plea hearing, in a letter dated September 30, 1991 to LeGrande, Krawczuk again confirmed that he did not wish to present mitigating evidence, stating that his goal was to receive a death sentence. Krawczuk's letter indicated his understanding that he could more easily secure a death sentence by ensuring that the aggravating circumstances outweighed any evidence in his favor.

The penalty phase before the jury was no different, as Krawczuk once again averred that he wished not to present mitigating evidence and that he was instructing LeGrande not to participate in the penalty phase proceedings. The one concession Krawczuk made to his lawyer's wishes was calculated to ensure a death sentence. Krawczuk allowed LeGrande to make a closing argument but only "for the purpose of preventing a reversal on the fact that no mitigating circumstances [were] introduced." Krawczuk also declined to testify.[8]

---

[8]Before the jury entered the courtroom at the penalty hearing on February 5, 1992, prompting by the court led Krawczuk to state that he was "willing to let [LeGrande]" present mitigating evidence, and that "part of [Dr. Keown's] report would be good." But this concession was quickly followed by a strong caveat. LeGrande relayed to the court that Krawczuk's "desire to have [the report] admitted has nothing to do with attempting to sway the jury on mitigating

Once again, at the subsequent Spencer sentencing hearing before the trial judge, LeGrande stated that Krawczuk had instructed her not to present any mitigating evidence. Krawczuk again refused to introduce Dr. Keown's report or provide his own comments in support of mitigation.

In light of this substantial evidence, the Florida Supreme Court's determination, that Krawczuk instructed his counsel not to present mitigating evidence, was not an unreasonable determination of the facts. Given this finding, we next explain why the Florida Supreme Court's ultimate decision—that Krawczuk had not established prejudice—was not contrary to or an unreasonable application of clearly established law.

## D. Krawczuk Did Not Satisfy Landrigan's First Requirement

To establish prejudice, Krawczuk must satisfy the first Landrigan requirement: a reasonable probability that, had he been more fully advised about the available mitigation evidence, he would have allowed counsel to present it on

---

circumstances." Krawczuk still "desire[d] to have the death penalty imposed . . . [and was] just attempting to prevent tying [LeGrande's] hands to the point . . . that the Appellate Court would overturn a death penalty."

When questioned by the trial court, Krawczuk confirmed his strategy. Regardless, this permission was short lived. When the court agreed to admit Dr. Keown's report, Krawczuk told LeGrande that he had changed his mind. The court then asked Krawczuk if "that [was his] final word on the matter," to which Krawczuk responded, "Yes, it is." Krawczuk also affirmatively replied when the court again sought clarification that Krawczuk did not "want to present any mitigating evidence [or] . . . testify as to additional mitigating evidence." Finally, Krawczuk confirmed that he understood the consequences of his actions and that he wished to waive closing argument.

45

his behalf.  Landrigan, 550 U.S. at 481, 127 S. Ct. at 1944; Strickland, 466 U.S. at 696, 104 S. Ct. at 2069.  Krawczuk's pattern of obstruction gave the Florida Supreme Court every reason to determine that Krawczuk could not show prejudice. Krawczuk rejected his counsel's presentation of mitigation evidence at three separate judicial proceedings, openly sought the death penalty, and repeatedly undercut LeGrande's strategy.  His actions were not taken in ignorance.  LeGrande had advised Krawczuk of the importance of mitigation evidence, and Krawczuk possessed Dr. Keown's report.

Later, during the 3.850 proceedings, Krawczuk presented no evidence indicating that, had he been made aware of the available mitigation evidence before the penalty phase, he would have allowed LeGrande to present it.  Notably, the record is devoid of any affidavit, deposition, or statement from Krawczuk, LeGrande, the mental health experts, or Krawczuk's friends and family even suggesting that Krawczuk would have instructed LeGrande differently had he been fully aware of all the available mitigation evidence.

In this appeal, Krawczuk contends that the Florida Supreme Court unreasonably applied Strickland by overlooking evidence indicating that there was a reasonable probability that he would have allowed the presentation of mitigation evidence.  Krawczuk points to evidence showing that he cooperated with Dr. Keown, volunteered details about his military service, signed releases for

46

counsel to obtain psychological information about his military service, offered general information about his wife and family, and at one point wavered slightly about mitigation evidence. As this Court recognized in Pope, however, the petitioner's burden to prove prejudice, as required under Strickland and Landrigan, cannot be met with evidence showing merely that the petitioner cooperated with counsel's efforts to investigate his personal background and that he at one point was open to presenting some mitigation evidence. Pope, 752 F.3d at 1266–67.

Rather, Krawczuk must "affirmatively establish" that he would have allowed the presentation of the undiscovered mitigation evidence. Id. at 1267. To hold that evidence of cooperation alone is sufficient would be to "reverse[] [Krawczuk's] burden." Id. The record as a whole gave the Florida Supreme Court ample grounds to conclude that Krawczuk had no interest in actually employing any mitigation evidence. He repeatedly stated that he sought the death penalty, wished to avoid reversal on appeal, and opposed the presentation of mitigation evidence. If anything, Krawczuk's early cooperation in producing mitigation evidence makes his later suppression of this information all the more voluntary and meaningful.

Simply put, because Krawczuk did not offer evidence affirmatively showing that he would have been willing to allow LeGrande to present the mitigation evidence that was uncovered during the 3.850 proceedings, he has not satisfied Landrigan's first requirement and is not entitled to habeas relief. See Landrigan,

47

550 U.S. at 481, 127 S. Ct. at 1944; Strickland, 466 U.S. at 696, 104 S. Ct. at 2069;

Pope, 752 F.3d at 1266–67.

### E. Krawczuk Did Not Satisfy Landrigan's Second Requirement

Even under de novo review, we hold that Krawczuk has failed to satisfy

Landrigan's second prejudice requirement that a petitioner must establish a

reasonable probability that, had the available mitigating evidence been presented at

the penalty phase, he would have received a life sentence instead of the death

penalty.  See Strickland, 466 U.S. at 696, 104 S. Ct. at 2069; Landrigan, 550 U.S.

at 481, 127 S. Ct. at 1944.  As an alternative and independent ground for the denial

of Krawczuk's ineffective counsel claim, we conclude that, after balancing the

totality of the available mitigation evidence against the aggravating evidence,

Krawczuk has not shown that he would have received a different sentence had the

available mitigation evidence been presented.

The state trial court found three statutory aggravating factors:  (1) the

murder was committed during a robbery and for pecuniary gain; (2) the murder

was especially heinous, atrocious, or cruel; and (3) the murder was cold,

calculated, and premeditated without any pretense of moral or legal justification.

Krawczuk does not argue that these findings were error.

As to statutory mitigating factors, we recognize that Krawczuk's mental

health experts, Dr. Crown and Dr. Sultan, testified that Krawczuk was under the

48

influence of an extreme mental or emotional disturbance and was incapable of conforming his conduct to the requirements of the law.  However, the state 3.850 court discounted the testimony of both mental health experts, and Krawczuk does not challenge this credibility determination as unreasonable.

This leaves only Krawczuk's non-statutory mitigating factors.  We further recognize that there is evidence that Krawczuk:  (1) was abandoned by his father; (2) was isolated during childhood; (3) was not supervised during his childhood; (4) sustained neuropsychological damage; (5) had mental disorders; (6) endured emotional and physical abuse; (7) experienced depressive symptoms; and (8) suffered sexual abuse on one occasion by strangers.

However, under de novo review, we readily conclude that Krawczuk failed to establish a reasonable probability that, had he presented the above mitigating evidence, the outcome of the proceedings would have been different.  See Landrigan, 550 U.S. at 481, 127 S. Ct. at 1944; Williams, 529 U.S. at 397–98, 120 S. Ct. at 1515.  In reaching this conclusion, we weigh the totality of the mitigating evidence against the aggravating factors, considering the substantial weight due to aggravation in light of the brutal nature of Staker's murder.

Though the mitigating evidence discovered after Krawczuk's sentencing would have painted a more robust picture of the emotional and physical abuse and tragic difficulties that Krawczuk faced during his childhood, the sentencing judge

49

was already aware, from Dr. Keown's report, that Krawczuk was subjected to some amount of serious emotional and physical abuse during his life. The more fulsome details of these childhood difficulties would not have been sufficient to overcome the severe aggravation inherent in the nature of Staker's murder. The evidence adduced at the penalty phase, and especially through Krawczuk's confession, establish that he planned for several days to murder Staker with his own bare hands and that he did so not only to profit from selling goods stolen from Staker's home, but also because of his disdain for Staker's sexual preferences. The method of Krawczuk's crime was particularly brutal. Krawczuk choked Staker for ten minutes before twice pouring drain cleaner down Staker's throat and taping a cloth over his mouth. This Court has upheld death sentences in other gruesome murder cases. See, e.g., Boyd v. Allen, 592 F.3d 1274, 1303–04 (11th Cir. 2010); Clisby v. State, 26 F.3d 1054, 1057 (11th Cir. 1994); Thompson v. Wainwright, 787 F.2d 1447, 1453–54 (11th Cir. 1986). Notably, there is no evidence of intellectual deficiency here, but rather powerful and substantial evidence of a carefully planned and brutal torture of Staker. Krawczuk's cruelty and premeditation make it unlikely that he would have received a different sentence.

In light of all the available evidence considered as a whole, it is not reasonably probable that the presentation of Krawczuk's entire mitigating evidence would have resulted in the imposition of a life sentence rather than the death

50

penalty.  In these circumstances, the presentation of new mitigating evidence "would barely have altered [Krawczuk's] sentencing profile."  See Strickland, 466 U.S. at 700, 104 S. Ct. at 2071.

On appeal, Krawczuk argues that the Florida Supreme Court failed to conduct any balancing of all mitigating and aggravating factors, and thus unreasonably applied Strickland in making its ultimate prejudice determination. See Porter v. McCollum, 558 U.S. 30, 42–43, 130 S. Ct. 447, 454–55 (2009).  It is true, as Krawczuk notes, that the Florida Supreme Court did not explicitly address the available mitigation evidence or weigh it against the aggravating evidence in reaching its prejudice decision.  But this seems to be the case because the Florida Supreme Court determined that Krawczuk would not have allowed his counsel to present mitigation evidence.  Krawczuk II, 92 So. 3d at 205.

Krawczuk's failure to meet this first prejudice requirement under Landrigan is sufficient to support the Florida Supreme Court's ultimate determination that Krawczuk did not establish prejudice.  The Florida Supreme Court thus did not need to address the second requirement of the Landrigan prejudice analysis, which requires the petitioner to show that, had the mitigating evidence been presented, the outcome of the proceedings would have been different.  Accordingly, because Krawczuk did not establish a reasonable probability that he would have allowed the presentation of mitigating evidence, the Florida Supreme Court did not act

51

unreasonably by failing to weigh the totality of the mitigating and aggravating evidence. Where it is clear that mitigating evidence would not have actually been presented to the jury, that alone means there is no prejudice. See Gilreath, 234 F.3d at 551 n.12 ("If Petitioner would have precluded [the] admission [of mitigating evidence] in any event, Petitioner was not prejudiced by anything that trial counsel did.").

In sum, on this record and even under de novo review, we hold that Krawczuk has not shown a reasonable probability that, had he presented all mitigating evidence, the outcome of the proceedings would have been different.

## F. The Decision of the Florida Supreme Court Was Not Unreasonable as to Investigation of Mitigating Evidence

Before concluding, we address Krawczuk's several separate claims about his trial counsel's investigation and why they are immaterial and irrelevant to the prejudice analysis.

Krawczuk argues that the Florida Supreme Court made an unreasonable determination of fact by concluding that Krawczuk instructed LeGrande not to investigate mitigating evidence. In particular, Krawczuk points to the Florida Supreme Court's statements that "Krawczuk would not permit his attorney to involve his family" and that he "repeatedly insisted that counsel not pursue mitigation and not involve his family." Krawczuk II, 92 So. 3d at 205. According to Krawczuk, these determinations made by the Florida Supreme Court are at odds

52

with the state 3.850 court's findings that "the record will not support the unequivocal direction to not <u>investigate</u>" mitigating evidence and that "counsel's performance was deficient in failing to purs[u]e further <u>investigation</u> of the family history or to obtain clear direction from Mr. Krawczuk that she was not to do so."

The problem for Krawczuk is the issue of LeGrande's <u>investigation</u> of mitigating evidence is not essential or even material to the Florida Supreme Court's conclusion that Krawczuk failed to establish prejudice. Given the record shows Krawczuk told his counsel not to <u>present</u> mitigation evidence, this precludes any need to examine the scope of counsel's investigation.

"[I]f a petitioner 'instructed his counsel not to offer any mitigating evidence,' then 'counsel's failure to investigate further could not have been prejudicial under <u>Strickland</u>.'" <u>Pope</u>, 752 F.3d at 1265 (quoting <u>Landrigan</u>, 550 U.S. at 475, 127 S. Ct. at 1940–41). "This principle rests on the theory that an obstructionist client would have prevented the introduction of any mitigation evidence that may have been discovered from a fuller search." <u>Pope</u>, 752 at 1265–66. The Supreme Court has never held that trial counsel must still undertake to investigate mitigating evidence where a competent defendant affirmatively and repeatedly instructs his attorney not to present mitigating evidence because he wants the death sentence. Rather, under <u>Landrigan</u>, the first requirement assumes that a defendant was more fully advised of the mitigation evidence and asks

53

whether the defendant has shown he would have allowed counsel to present it. See 550 U.S. 479–81, 127 S. Ct. at 1942–44. Krawczuk has not satisfied that requirement.

The Supreme Court also has "never imposed an 'informed and knowing' requirement upon a defendant's decision not to introduce evidence." Id. at 479. Therefore, because Krawczuk issued unmistakable instructions to his attorney not to present any mitigation evidence, his trial counsel's lack of investigation is immaterial to the prejudice analysis.

Furthermore, while Krawczuk's instructions regarding the investigation of mitigating evidence are relevant to the deficiency prong of the Strickland analysis, the Florida Supreme Court's decision rested not on the deficiency vel non of counsel's performance, but rather on the independent conclusion that Krawczuk failed to establish prejudice. Krawczuk II, 92 So. 3d at 205. For purposes of establishing prejudice under the circumstances presented here, the inquiry depends only on (1) whether the defendant instructed his counsel not to present mitigating evidence and (2) whether the defendant has satisfied the two Landrigan requirements. See Landrigan, 550 U.S. at 481, 127 S. Ct. at 1944 (concluding that the petitioner was not entitled to habeas relief because the petitioner "would not have allowed counsel to present any mitigating evidence" and "the mitigating

54

evidence he seeks to <u>introduce</u> would not have changed the result" (emphasis added)).

The distinction between instructions not to <u>investigate</u> and instructions not to <u>present</u> mitigating evidence is underscored by the United States Supreme Court's above-quoted observation in <u>Landrigan</u> that, if the defendant "instructed his counsel not to offer any mitigating evidence," then "counsel's failure to investigate further could not have been prejudicial under <u>Strickland.</u>"  <u>Id.</u> at 475, 127 S. Ct. at 1941; <u>see</u> <u>Allen v. Sec'y, Fla. Dep't of Corr.</u>, 611 F.3d 740, 763–64 (11th Cir. 2010) (applying <u>Landrigan</u> and concluding that, in light of the defendant's decision not to present mitigating evidence, counsel's failure to conduct pre-waiver investigation of mitigating evidence was not prejudicial).  To some extent, Krawczuk's reply brief acknowledges the distinction, stating that issues pertaining to investigation of mitigation and presentation of mitigation "are closely related <u>but</u> <u>different</u>."

Accordingly, whether or not the Florida Supreme Court unreasonably determined that Krawczuk instructed LeGrande not to investigate mitigating evidence is not relevant to the outcome of the prejudice analysis in his case.  What matters for purposes of prejudice is whether Krawczuk instructed counsel not to present mitigating evidence.

Relatedly to the issue of LeGrande's investigation of mitigating evidence, we also reject Krawczuk's argument that his waiver of the opportunity to present mitigation evidence was not sufficiently informed and knowing because LeGrande conducted only a limited pre-waiver investigation of mitigating evidence. In <u>Landrigan</u>, the United States Supreme Court noted that it has "never imposed an 'informed and knowing' requirement upon a defendant's decision not to introduce evidence." 550 U.S. at 479, 127 S. Ct. at 1942. Krawczuk identifies no Supreme Court authority post-<u>Landrigan</u> indicating that a competent capital defendant's decision not to present any mitigating evidence may be informed or knowing only if trial counsel first thoroughly or even adequately investigates the mitigating evidence and tells her client about it. To the contrary, there is no such investigation requirement in this type of case where the defendant instructs his counsel not to present mitigation evidence.

## VIII.  CONCLUSION

For all of the foregoing reasons, we conclude that Krawczuk is not entitled to habeas relief on his ineffective assistance of counsel claim as to mitigating evidence in the penalty phase and affirm the district court's denial of Krawczuk's § 2254 petition.

**AFFIRMED.**

56

MARTIN, Circuit Judge, concurring in the judgment:

I concur in the result reached by the majority because binding circuit precedent precludes relief for Mr. Krawczuk here.[1]  This Court's rule is that a defendant who instructs his attorney not to present mitigating evidence at trial "must make two showings" to demonstrate prejudice in support of an ineffective assistance of counsel claim.  Gilreath v. Head, 234 F.3d 547, 551 (11th Cir. 2000).  First, the defendant must show "a reasonable probability that—if [he] had been advised more fully about [mitigating] evidence or if trial counsel had requested a continuance—[he] would have authorized trial counsel to permit such evidence at sentencing."  Id. at 551.  Second, he must show that "if such evidence had been presented at sentencing, a reasonable probability exists that the jury would have concluded that the balance of aggravating and mitigating circumstances did not warrant death."  Id. at 552 (quotation omitted).  My review of the record reflects that Mr. Krawczuk failed to make these showings.

---

[1] I have some doubt that the Florida Supreme Court's decision warrants deference under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), 28 U.S.C. § 2254(d).  The Florida Supreme Court based its decision—at least in part—on Mr. Krawczuk's "repeated[] instist[ence] that counsel not pursue mitigation and not involve his family."  Krawczuk v. State, 92 So. 3d 195, 205 (Fla. 2012).  My review of the record has revealed no evidence that Mr. Krawczuk instructed counsel not to involve his family.  The most compelling evidence to this effect is trial counsel's testimony at the post-conviction hearing that Mr. Krawczuk "kind of wanted to leave his family out of it."  My doubts make no difference to Mr. Krawczuk, however.  Even if we set aside the Florida Supreme Court decision and conduct our own de novo review of his claims, Mr. Krawczuk still would not, in my view, win this appeal.

57

This Court has said the rule established in <u>Gilreath</u> "is consistent with" the Supreme Court's decision in <u>Schriro v. Landrigan</u>, 550 U.S. 465, 127 S. Ct. 1933 (2007).[2] <u>Cummings v. Sec'y for Dep't of Corr.</u>, 588 F.3d 1331, 1360 (11th Cir. 2009). Therefore, Mr. Krawczuk can succeed on his ineffective assistance claim only if he demonstrates a reasonable probability that, if he had been more fully

---

[2] Of course, saying a rule established by our Court is <u>consistent</u> with Supreme Court precedent is different from saying that the rule is <u>required</u> by Supreme Court precedent. I fear the majority treats <u>Gilreath</u>'s two-part prejudice standard as being required under <u>Landrigan</u> in every case where a defendant tells his lawyer he does not want to present mitigation. <u>See</u> Maj. Op. at 42, 45. The Supreme Court's decision in <u>Landrigan</u> was not so broad.

Mr. Landrigan actively interfered with his counsel's efforts to present mitigation by "repeatedly [interrupting] when counsel tried to proffer <u>anything</u> that could have been considered mitigating," regardless of its form. <u>Landrigan</u>, 550 U.S. at 476, 127 S. Ct. at 1941 (emphasis added). Applying AEDPA's deferential standard of review, the Supreme Court decided that the state court reasonably determined "that Landrigan would have undermined the presentation of any mitigating evidence that his attorney might have uncovered." <u>Id.</u> at 477, 127 S. Ct. at 1941. Thus the Supreme Court held, in turn, that the District Court did not abuse its discretion when it found that Mr. Landrigan would have refused to allow his counsel to present any mitigation whatsoever and for that reason failed to show prejudice. <u>Id.</u> at 477, 127 S. Ct. at 1942.

<u>Landrigan</u> did not, however, establish a rule that if any defendant tells his lawyer he wants no mitigation presented, he can never show prejudice under <u>Strickland v. Washington</u>, 466 U.S. 668, 104 S. Ct. 2052 (1984), unless he satisfies the two-part test required under <u>Gilreath</u>. <u>See Blystone v. Horn</u>, 664 F.3d 397, 424–26 (3d Cir. 2011) (limiting <u>Landrigan</u> to cases where the defendant has demonstrated a strong determination not to present <u>any</u> mitigating evidence, and concluding "[t]he fact that [the defendant] chose to forego the presentation of his own testimony and that of [] two family members . . . simply does not permit the inference that, had counsel competently investigated and developed expert mental health evidence and institutional records, [the defendant] would have also declined their presentation"). To the extent that the majority's opinion equates the requirements of our circuit's precedent with that of the Supreme Court's precedent, I believe it is mistaken.

I also disagree with the majority's suggestion that trial counsel's duty to perform a constitutionally adequate mitigation investigation is obviated by a defendant's communication to his attorney that he does not wish to present mitigation. <u>See</u> Maj. Op. at 53. <u>Landrigan</u> never addressed the performance prong of <u>Strickland</u>, and so it did nothing to alter trial counsel's perennial "obligation to conduct a thorough investigation of the defendant's background." <u>Williams v. Taylor</u>, 529 U.S. 362, 396, 120 S. Ct. 1495, 1515 (2000). Again however, even setting these problems aside, I don't believe Mr. Krawczuk can prevail in this appeal.

58

advised about the mitigating evidence and its significance, he would have allowed trial counsel to present the evidence at sentencing. Mr. Krawczuk presented no such evidence. That means, under the law of this circuit, he cannot meet his burden to show prejudice under Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052 (1984).

Because Mr. Krawczuk's failure to present evidence that he would have allowed presentation of a mitigation case is dispositive of his claim, there is no need for the panel to reach the second prong of the prejudice inquiry. See Conner v. GDCP Warden, 784 F.3d 752, 769 & n.17 (11th Cir. 2015). The majority's discussion of this topic is therefore unnecessary. I mention this because I respectfully disagree with how the majority resolved this issue, once it undertook to decide it. Like the majority, I look at this question de novo. See Maj. Op. at 49. For me, there is certainly a reasonable probability that, if the available mitigation evidence had been presented, Mr. Krawczuk would have received a life sentence.[3]

---

[3]In reviewing the record in this case, I became troubled by an issue related to Mr. Krawczuk's failure to present a mitigation case, which is not before the court in this appeal. There is an indication that Mr. Krawczuk may have been misguided by his trial counsel's statements, to think that he would only be allowed to present mitigation evidence if he agreed to testify. In a letter dated March 8, 1991, counsel advised Mr. Krawczuk on what she believed were potential mitigating factors, and wrote that some of the mitigation "will depend upon your testimony at trial and the findings of Dr. Keown." Then at the jury trial on penalty, when the trial judge asked if counsel would be making a closing argument, she replied that no mitigating evidence had been presented and so "it would be necessary for [Mr. Krawczuk] to take the stand to present the mitigating evidence" in order for her to make an argument based on mitigation.

There is, of course, no requirement under state or federal law that a defendant must testify in order to present mitigation evidence in his capital trial. Therefore, if trial counsel

59

At the postconviction evidentiary hearing, several witnesses testified to the "catastrophic" emotional and physical abuse Mr. Krawczuk experienced throughout his childhood. This testimony described the constant physical violence Mr. Krawczuk received at the hands of his "brutal" mother. There was testimony that she used Mr. Krawczuk as her "whipping post" and punished him by holding his hand to a hot stove burner. Witnesses also told of the severe emotional abuse and neglect Mr. Krawczuk experienced. His mother made fun of his ears, calling him "Dumbo, the flying fucking elephant," and she "never showed any kind of affection or love to [him.]" When Mr. Krawczuk would sometimes soil or wet himself as a child, his mother would force him to wear the soiled garments on his head or, on one occasion, stand in front of his home wearing a sign that said "I do my doodie in my pants every day."

Mr. Krawczuk also presented testimony from two mental health experts. Dr. Barry Crown testified that Mr. Krawczuk had brain damage resulting in impaired reasoning and judgment and that his mental processing abilities were at the level of a thirteen-year-old. According to Dr. Crown, these mental problems impaired Mr. Krawczuk's ability to understand the long-term effects of his behavior. Dr. Faye

---

improperly indicated to Mr. Krawczuk that he was required to testify at the penalty phase in order to introduce mitigation, this would constitute deficient performance. See Hinton v. Alabama, 571 U.S. ___, 134 S. Ct. 1081, 1089 (2014) ("An attorney's ignorance of a point of law that is fundamental to his case combined with his failure to perform basic research on that point is a quintessential example of unreasonable performance under Strickland.").

Sultan testified that Mr. Krawczuk suffered from a cognitive disorder that resulted in decreased impulse control, impaired reasoning, and learning problems.  She testified that this "overriding blanket of dysfunction" influenced "all of his behavior."

None of this testimony was rebutted.  And all of it was clearly relevant mitigation.  See Porter v. McCollum, 558 U.S. 30, 41–43, 130 S. Ct. 447, 454–55 (2009) (considering evidence of defendant's "brain abnormality and cognitive defects" as relevant mitigation); Williams v. Taylor, 529 U.S. 362, 398, 120 S. Ct. 1495, 1515 (2000) ("[T]he graphic description of Williams'[s] childhood, filled with abuse and privation . . . might well have influenced the jury's appraisal of his moral culpability."); Penry v. Lynaugh, 492 U.S. 302, 319, 109 S. Ct. 2934, 2947 (1989) ("[E]vidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse." (quotation omitted)).

Yet the jury who recommended that Mr. Krawczuk be put to death heard nothing in mitigation—not even a bare plea for mercy from trial counsel.  Mr. Krawczuk's lawyer spoke not a word to the jury about what penalty to impose.  At

61

the Spencer hearing before the trial judge,[4] counsel again offered no mitigating evidence or argument.  That meant all the sentencing judge had to aid him in arriving at the sentence for Mr. Krawczuk was the presentence investigation report and a seven-page report from Dr. Richard Keown, who was the psychiatrist who conducted a pretrial competency evaluation.  The psychiatric report referred to Mr. Krawczuk's abusive upbringing, but—as the state postconviction court found—it did not "contain the quality of the evidence regarding his mother's abuse that was later brought out in the evidentiary hearing."

Thus, this is not a case where the new mitigation evidence "would barely have altered the [defendant's] sentencing profile."  Strickland, 466 U.S. at 700, 104 S. Ct. at 2071.  Under Florida law at the time, the trial judge was required to give the jury's advisory verdict on the sentence "great weight."  See Hurst v. Florida, 577 U.S. ___, 136 S. Ct. 616, 620 (2016) (quotation omitted).[5]  At trial, the jury heard nothing that would humanize Mr. Krawczuk or help put into context the horrible crime he committed.  If the available mitigation had been presented, the jury would have learned of "the kind of troubled history [the Supreme Court] ha[s]

---

[4] Under Florida law, a Spencer hearing gives the defendant, his counsel, and the State the opportunity to be heard and to present additional evidence to the sentencing judge after the jury has offered its recommendation.  See Spencer v. State, 615 So. 2d 688, 691 (Fla.1993) (per curiam).

[5] Florida has since amended its capital sentencing scheme, and the Florida Supreme Court has held that "in order for the trial court to impose a sentence of death, the jury's recommended sentence of death must be unanimous."  Hurst v. State, 202 So. 3d 40, 44 (Fla. 2016) (per curiam).

62

declared relevant to assessing a defendant's moral culpability." Wiggins v. Smith, 539 U.S. 510, 535, 123 S. Ct. 2527, 2542 (2003). It would have also learned of Mr. Krawczuk's brain damage and mental problems. I recognize that Mr. Krawczuk committed a terrible crime. But if the jury had heard the available mitigating evidence, there is surely a reasonable probability that it would have recommended a life sentence. See Porter, 558 U.S. at 41–44, 130 S. Ct. at 453–55 (considering the probable effect of the unpresented mitigation on the jury's recommended sentence). This recommendation would have been entitled to "great weight" by the sentencing judge, who would have also heard the true extent of the abuse Mr. Krawczuk suffered throughout his childhood and learned of his mental impairments. On this record, I believe Mr. Krawczuk has demonstrated a reasonable probability of a different outcome. Because the majority and I come to a different conclusion on the issue of whether Mr. Krawczuk was prejudiced by having no mitigation case presented, I cannot join its opinion.

As to whether Mr. Krawczuk can prevail in this appeal, however, I must agree with the majority that he cannot.